DOUGLAS L. KLUENDER, PERSONAL REPRESENTATIVE OF THE ESTATE OF GLENN R. GRAY, DECEASED, APPELLANT, V. PETE MATTEA, DOING BUSINESS AS PETE'S AUTO DAMAGE APPRAISERS, AND SAHLING KENWORTH, INC., A NEBRASKA CORPORATION, ET AL., APPELLEES.

334 N.W.2d 416

Filed May 13, 1983. No. 81-831.

William A. Wieland of The Healey Law Office, for appellant.

Richard D. Sievers, for appellee Mattea.

Jeffrey H. Jacobsen, for appellee Sahling Kenworth.

KRIVOSHA, C.J., BOSLAUGH, MCCOWN, WHITE, HASTINGS, and CAPORALE, JJ., and MORAN, D.J.

HASTINGS, J.

This was a wrongful death action brought by Douglas L. Kluender, personal representative of the estate of Glenn R. Gray, deceased, against Pete Mattea, doing business as Pete's Auto Damage Appraisers, and Sahling Kenworth, Inc., a Nebraska corporation. Damages were sought arising out of a motor vehicle accident which occurred on July 16, 1975. It was alleged that the accident was caused by reason of a defective steering gear cross-shaft which fractured due to normal driving fatigue, causing the decedent to lose control of the tractor-trailer which he was driving. As a result, it was alleged, he collided with a gas transport truck, by reason of which he suffered fatal injuries.

It was plaintiff's theory that this same tractor, while being driven by someone else, had been involved in a rollover accident in Kansas on May 28,

1975. The damage had been inspected by the defendant Mattea, who made a written detailed estimate of necessary repairs, and the defendant Sahling had actually performed the repairs according to that estimate. The plaintiff postulates that this cross-shaft was partially fractured in the May 28 accident and that both defendants were negligent in failing to inspect and discover that damage and in failing to warn of the defect or failing to replace the damaged part. The case was submitted to a jury on the plaintiff's theory, which returned a verdict in favor of both defendants. A motion for a new trial was overruled and this appeal followed.

The plaintiff has assigned as error on the part of the trial court its failure to give certain of plaintiff's requested instructions and the admission into evidence of certain of the defendants' scientific tests and accompanying expert opinion based upon what the plaintiff claims was materially changed or altered testimony.

Detailed testimony was offered as to the facts and circumstances of the first, or Kansas, accident, as well as the inspections and repairs made and not made by the defendants. It must be assumed that the jury considered all such evidence, and it is therefore unnecessary for us to detail that evidence.

The fatal accident, the one of July 16, 1975, occurred around 2 o'clock in the morning. According to the driver of the other vehicle involved, and the only eyewitness, Henry Angle, he observed the headlights of an oncoming vehicle in its proper lane. That vehicle was approximately 1½ miles away. Both Angle and the driver of the other vehicle, who turned out to be the plaintiff's decedent, dimmed their lights. However, when the vehicles were about 200 feet apart, Angle observed the decedent's vehicle all of a sudden start moving over into the other lane and coming right toward him. Immediately thereafter, the collision occurred between the left front corner of the decedent's tractor and the left front

corner of the other vehicle. The impact tore the left front wheel of Angle's truck loose, as well as the front axle, the catwalk off the left side, and also tore out the left-hand side of the rear axle. As to the decedent's tractor, in the words of the witness Angle, "the left front wheel was broken off, and then he went into the ditch and the fifth wheel came loose, made a terrible mess out of everything."

Because the primary issue in this case is whether the cross-shaft was partially fractured in the May 28 accident and then gave way completely because of fatigue, thereby causing the fatal accident, or whether control was lost because of some other factor and the shaft was completely and initially fractured in the fatal accident, the greater portion of the record is devoted to the testimony of various expert witnesses, their examinations, scientific experiments, and theorizations. The theories of both sides were submitted to the jury and it accepted that of the defendants. No claim is made that there is no competent evidence to support the verdict, and in the absence of prejudicial error in one or more of the claims made by the plaintiff, the verdict and judgment must be affirmed. *Diesel Service, Inc. v. Accessory Sales, Inc.*, 210 Neb. 797, 317 N.W.2d 719 (1982).

Plaintiff first complains of the failure of the trial court to give his requested instruction No. 16. This instruction in effect would have directed the jury that the violation of any regulation would not of itself be negligence, but only evidence of negligence to be taken into consideration with all other facts and circumstances. According to the plaintiff, this instruction was necessary because counsel for one of the defendants, on cross-examination of Robert Wenzl, the owner of the tractor and decedent's employer, inquired as to whether the Department of Transportation and Federal Highway Administration regulations required regular inspections of the vehicles being operated on the road. After several

objections voiced by plaintiff's counsel, the witness answered that drivers are required to make daily vehicle inspections, and the maintenance shop or mechanics were not required by regulations to make any inspections. He did agree that the drivers were required to make daily inspection reports which included the steering system, not by detailed observations of every joint, but by merely turning the steering wheel.

A copy of these federal regulations, exhibit 40, was introduced in evidence by the plaintiff and received by the court. Those regulations, 49 C.F.R. § 396.7 (1978), provided that "every driver shall prepare such a report in writing at the completion of his day's work or tour of duty, which report shall list any defect or deficiency of the motor vehicle discovered by said driver or reported to him as would be likely to affect the safety of operation of the motor vehicle . . . ." Those same regulations contain a suggested "Driver's Vehicle Condition Report" form containing approximately 40 items such as lights, fuel, brake lines, cooling system, clutch, brakes, transmission, steering, etc., with boxes alongside each item and directions that a "check" mark be placed beside each item which is satisfactory and an "x" beside those which are not. § 396.9. There is nothing in the regulations describing in what manner an inspection of the steering shall be made. There is nothing in the evidence suggesting that Wenzl or any of his employees had violated these regulations by failing to make out the regular inspection reports.

The deficiency in the plaintiff's position is that there was neither pleading nor proof of a violation of federal regulations. A trial court is not required to give a proffered instruction upon a subordinate issue or which unduly emphasizes a part of the evidence in a case. *Bowley v. Airport Authority*, 186 Neb. 292, 182 N.W.2d 911 (1971). As a matter of fact, the trial court must eliminate all matters not in dispute and

submit to the jury only the controverted questions of fact upon which the verdict must depend. *Ferlise v. Raznick*, 202 Neb. 745, 277 N.W.2d 94 (1979). It was not error to fail to give the tendered instruction.

It is next contended by the plaintiff that the trial court erred in failing to give its requested instruction No. 11, "A person may assume that every other person will use reasonable care and perform in accordance with the law until the contrary reasonably appears." This is similar to NJI 3.01. Again, the plaintiff argues that the defendants raised the issue of what, if any, obligation others than the defendants had to make further inspections, i.e., did the deceased driver or his employer or fellow employees have any obligation to doublecheck the defendants' work?

In the first place, although contributory negligence on the part of the plaintiff's decedent was originally alleged in the pleadings, before final submission to the jury that allegation was deleted at the request of the defendants. A reference to the authorities cited under NJI 3.01 will disclose that this instruction is essentially applicable in contributory negligence situations.

Secondly, as previously pointed out, there was neither pleading nor proof that others than the defendants had failed to inspect the damage or the repairs. The closest that anyone got to making that suggestion was plaintiff's counsel himself when, in reading from the federal regulations which he introduced, he inquired of Mr. Wenzl: "Were you aware of the following provisions: 'No motor carrier shall permit or require a driver to drive nor shall any driver drive a motor vehicle which has been damaged in an accident or by other cause, until inspection has been made by a person qualified to ascertain the nature and extent of the damage and the relationship of such damage to the safe operation of the motor vehicle, nor shall such motor vehicle be operated until such person has determined it to be in

a safe operating condition.' '' However, in the first place no answer to the question appears in the record, nor does the record disclose that such inspections were not made. Secondly, a party cannot be heard to complain of error which such party was instrumental in bringing about. *Foreman & Clark of Nebraska, Inc. v. City of Omaha*, 203 Neb. 746, 280 N.W.2d 892 (1979).

Finally, as to claimed instructional errors, the plaintiff contends that the court's instruction No. 12, based on NJI 3.42, was incomplete. That is the concurrent negligence instruction, which was given as follows: ''Where the independent acts or omissions to act of two or more persons combine to proximately cause an injury indivisible in its nature, each such act or omission to act is itself a proximate or concurrent cause, and any one or more of such persons may be held responsible for the entire injury. This is true even though one may have been more negligent than the other.'' Not given was the last sentence of NJI 3.42, which appears in parentheses: ''It is no defense that all those who might have been held responsible are not made parties to this action.'' That portion was requested by the plaintiff but refused by the trial court.

Again, the plaintiff's theory is that the defendants raised the issue of the failure of Wenzl or his employees to make appropriate inspections of the tractor following the repairs necessitated by the first accident. What we have said previously in this regard is equally applicable here and dispositive of the plaintiff's complaint. There simply was no evidence of the omission from the lawsuit of any additional parties who might have been held responsible, and therefore no support in the record for the giving of such an instruction. Generally, the trial court is not required to instruct negatively. *Gee v. Dinsdale Brothers, Inc.*, 207 Neb. 224, 298 N.W.2d 147 (1980).

Finally, we consider the admission of certain of the defendants' scientific tests and the testimony of

their expert witness, Douglas Thurley. Thurley was the chief engineer and later, until 1976, plant manager of Gemmer Division of Ross Gear Company, which manufactures the worm and roller steering gear used in most mediumweight and heavy-duty trucks, and that involved in this accident. As of the date of trial he was director of product reliability for Ross Gear.

Available to the parties was the cross-shaft and roller assembly retrieved from the wrecked tractor driven by the decedent in the fatal accident, exhibit 22. This shaft was fractured at right angles, through the splines which fit into the pitman arm. As previously suggested, the primary issue in this lawsuit was when, why, and how the fracture occurred. In an effort to shed some light on those questions, a series of two impact tests were performed by Mr. Thurley at the Ross Gear plant in La-Fayette, Indiana, on June 10, 1981. Present at those tests, which were video taped, were counsel for the defendants, as well as counsel for the plaintiff and his expert witness, Richard Large.

As testified to by Mr. Large, in the first test a hydraulic ram was attached to the end of the pitman arm. The ram was then withdrawn so as to apply a twisting force to the cross-shaft. However, the rotation was not sufficient to cause a complete fracture, so the ram was repositioned, a new load was applied, and the fracture was completed. On the second test the hydraulic ram was repositioned so that it could be pulled farther, but the initial force again was not sufficient to cause a complete break, and it was necessary to move the ram and apply a second force to cause separation. An examination of the fractured shafts, exhibits 56 and 57, reveals 90-degree breaks similar in appearance to that on exhibit 22.

In the first test the evidence disclosed that the initial force applied to the cross-shaft was 104,000 inch-pounds; that the shaft broke to an unknown

depth and the ram bottomed out, following which the repositioning was done and a second torque of 11,500 inch-pounds was applied. In the second test a similar initial torque was applied, followed by a second application of 2,000 inch-pounds. The plaintiff therefore argues that this proves his contention that the shaft in the fatal accident had been cracked in the May 28 accident, following which a driving maneuver, such as crossing railroad tracks, applied the second unusual pressure, causing the complete fracture.

However, in his testimony Mr. Thurley indicated that the reason for the failure to completely fracture the shafts in these two tests was due to the shortness of the stroke of the hydraulic ram. Additionally, he gave as his opinion, assuming that in the fatal accident the left side of the axle had been driven back 3 feet, that that would exceed any travel that was present on the test machine, and with sufficient force the pitman arm would either be torn off the shaft or the shaft would fracture at the pitman arm.

At a later time, following the video-taped session, Mr. Thurley conducted three additional tests or experiments. Basically, the same physical setup was employed. In the first test an initial impact load of 102,000 inch-pounds was applied. This twisted the cross-shaft but did not fracture it. Thereafter, a fatigue test was performed wherein a series of 162,420 cycles with a load of 21,000 inch-pounds each were applied to the shaft before it twisted off. According to the witness Thurley, the purpose of this test was to demonstrate what a shaft would look like if it were impacted sufficiently in an accident so as to crack and twist it, and then were to go back into service and fail due to a combination of fatigue and the prior damage. This particular shaft fractured at a 45-degree angle. According to the witness, this test also demonstrated that after an impact sufficient to twist a shaft, it would still be capable of performing 50-plus years of "dry parking."

Two facts should be pointed out at this time. The tractor in which the decedent was killed had only been driven about 12,000 miles of normal over-the-road straight-down-the-highway driving between the May 28 accident and the fatal accident. Secondly, "dry parking" is very difficult to do. It requires a force of 21,000 inch-pounds to turn the front wheels of a vehicle to full lock while standing still, and this is considered the maximum load ever applied in normal usage.

In the second test eight successive load forces were applied to the shaft, beginning with 68,000 inch-pounds and ending with 104,000 inch-pounds. This resulted in a shaft which was literally cracked right through so that one end of the shaft was moved away from the other end and yet still stuck together. Following that, 21,000 inch-pounds of fatigue were applied and it required 99,390 cycles before the shaft fell apart. According to Mr. Thurley, this was equivalent to 33 years of "dry parking." The fracture on this shaft was also at about a 45-degree angle.

The final test that Mr. Thurley ran involved four initial impacts beginning with 89,300 inch-pounds and ending with one of 105,250 inch-pounds, after which 177,370 fatigue cycles of 21,000 inch-pounds were applied before the shaft fell apart. Mr. Thurley gave as his opinion that the shaft in question failed as the result of a single overload.

During the course of Mr. Thurley's testimony, he examined the cross-shaft taken from the tractor driven by the decedent, and described the twist in the splines. He said: "And so if you were to twist the output shaft about fifteen degrees, which is, just eyeballing it, what that looks like, you literally move the Pitman arm fifteen degrees off center but the gear is still on center, but you move the Pitman arm fifteen degrees out of the straight-ahead position." His conclusion in that regard was that with a cross-shaft having such a twist in it, the steering wheel

would have 6 inches of play in it which would cause the vehicle to wander and it would be necessary to adjust the drag link by 2.6 inches in order to successfully operate the tractor.

Later on in his testimony, Mr. Thurley was asked these questions and gave these answers: "Q . . . You've said a fifteen-degree twist in this shaft for Mr. Gray's truck today, and at the time of your deposition in Indiana, I believe you said a five- or ten-degree twist? A Right. Q How do you account for the difference? A Well, we were eyeballing the serration, the visible twist in the serration. But as more twist goes into that shaft, because you've got all that body of bearing diameter that is twisted up — Q When you were talking about a five- to ten-degree twist, in your deposition, were you talking simply about the — what one can see of the splines? A Right. Q All right. Now, Mr. Thurley, when you twist a piece of metal, do you have what is called the barber-pole effect? A Oh, some people might refer to that. . . . So if I were to put a Pitman arm on here and start to twist that shaft, I twist the serrations here. That's assuming that I twist them to the point that they take a permanent set and don't come back. And what happens is that this is only the physically visible evidence of a twist which actually goes up around that shaft like a barber pole. So that you're looking at some twist here but there's more twist in this area up here, as well, which doesn't show up visibly. Q Is it correct then, that although all the twists that you can see is in the splines, that actually the metal twists on back of the splines? A Yeah, you're actually twisting from this solid body back here, so this has all got some twist in it. Q And if these splines went all the way back to the solid body, they twist — A They should look something like that barber pole. Q And so if you look purely at this, just the splines, is that where you see the five- to ten-degree bend — A That's what I was looking at,

just about eyeballing between the difference of the serrations — Q Then where do you get the additional — up to fifteen? A It's taken up in the body of the bearing, or the shaft, the body of the shaft."

On foundational examination by plaintiff's counsel, Mr. Thurley agreed that his testimony at trial was different than that which he gave in his June 10, 1981, deposition regarding the amount of twist in the cross-shaft.

Plaintiff also complains of the use by Mr. Thurley of the "dry parking" illustration as a test factor. His counsel inquired of the witness on cross-examination: "Q Well, is using a dry park rating a realistic way of testing steering mechanism? A We believe so, yes. Q Okay. Do you think it's a realistic use by the driver of the steering mechanism? A The dry park? Q Yes, sir. A Well, he does dry park the vehicle and we don't want the gear to break while he's dry parking it. *So it's realistic testing.* Q I'm going to call your attention to your deposition, page 76. I asked you this question back there in LaFayette. 'Sir, the dry steering condition really isn't a realistic use of the driver or his steering mechanism, is it?' Did I ask you that? A That's right. Q Did you give the answer: 'In real life, no, I suppose not, because the guy would quit, you know. He would do something to get it rolling, to reduce the load, yes.' You gave that answer, didn't you? A Right. . . . [B]ut I've seen gears that have been destroyed by that maneuver [dry parking]. Q All right. So when they take one of these shafts and give it 177,370 licks of dry turning, that really doesn't duplicate what one driver does in his lifetime, does it? A No. Q As a matter of fact, you'd probably have to have the lifetime of three drivers on that steering gear to make it right? A Right." (Emphasis supplied.)

The plaintiff concedes that evidence relating to an illustrative experiment is admissible if a competent person conducted the experiment, an apparatus of

suitable kind and condition was utilized, and the experiment was conducted fairly and honestly. *Shover v. General Motors Corp.*, 198 Neb. 470, 253 N.W.2d 299 (1977).

The tests complained of were conducted by the same person, with the same equipment, and in basically the same manner as those first two tests which the plaintiff approved of and introduced in evidence. It is true that the first series of tests were utilized to apply a single initial force sufficient to cause instantaneous fracture. It is apparent that due to either lack of sufficient impact or shortness of travel, such result was not obtained. In the second series of tests it would appear that the purpose was to test the plaintiff's theory of an initial force creating a partial fracture, followed by a series of fatigue incidents whose cumulative effect was to cause the final, fatal fracture. In comparing the two series of tests we see nothing about the second series which was any more unreliable than the first, and the plaintiff simply cannot have it both ways.

His principal objection seems to rest on the claimed change in testimony on the part of Thurley. He relies on *Momsen v. Nebraska Methodist Hospital*, 210 Neb. 45, 313 N.W.2d 208 (1981), in which, in a syllabus point, we said: "Where a party, without reasonable explanation, changes his testimony concerning the material facts on a vital issue, such change clearly being made to meet the exigencies of pending litigation, the testimony is discredited as a matter of law and should be disregarded." The defendants argue that, as stated by this court in *Insurance Co. of North America v. Omaha Paper Stock, Inc.*, 189 Neb. 232, 202 N.W.2d 188 (1972), this rule applies only to a party-witness, and " 'contradictory statements of nonparty witnesses under circumstances disclosed in this case are not governed by this rule and such contradictions may be submitted to the jury as affecting the weight of the evidence and the credibility of the witnesses.' " *Id.* at 235,

202 N.W.2d at 190. However, the plaintiff answers that an expert witness called by a party litigant is clearly aligned with the party calling him, and an alteration of testimony by that expert witness to meet the exigencies of the case falls clearly within the *Momsen* rule.

We need not decide that issue. *Momsen* unequivocally states that it must be "clearly apparent the party has made the change to meet the exigencies of the pending case, and that there is no rational or sufficient explanation for the change in testimony. The rule would not, for example, necessarily apply in an automobile case where a party in his deposition testifies to his estimate of certain distances and then before trial, after a visit to the scene and viewing landmarks, makes measurements and changes his estimates." *Id.* at 55, 313 N.W.2d at 213.

As to the degree of twist in the cross-shaft, we believe that the witness offered a rational or sufficient explanation for the change in testimony. The witness stated that his estimate was made by just "eyeballing" the shaft. Plaintiff's counsel conceded during argument that no one had accurately measured the twist. Thurley explained how 5 to 10 degrees of the twist appeared in the splines, whereas the additional 5 degrees were added when he considered the "barber pole" effect on the shaft on beyond the splines. We do not agree that his testimony should have been excluded under the *Momsen* rule.

We do not understand Mr. Thurley's testimony regarding "dry parking" as indicating that it is a realistic, ordinary, everyday maneuver performed by truckdrivers or that it is necessary that such be the case. We understand the position of the witness to be that "dry parking" is a maximum force maneuver to be used in testing the reliability of the steering equipment, and if a nearly separated shaft would still tolerate from 30 to 50 years of such maneuvers, it would be unusual to expect a series of

lesser fatiguing operations to cause such separation in a period of 1 month of normal driving.

"The trial court has a wide discretion in determining whether evidence relating to illustrative experiments should be received. [Citations omitted.] A judgment will not be reversed on account of the admission or rejection of such testimony unless there has been a clear abuse of discretion." *Shover v. General Motors Corp.*, *supra* at 474, 253 N.W.2d at 303. There was no clear abuse of discretion in this case.

The judgment of the District Court is affirmed.

AFFIRMED.