EUGENE AND CONNIE KUDLACEK, GUARDIANS AND CONSERVATORS OF CHRISTOPHER KUDLACEK, A PROTECTED PERSON, APPELLANTS AND CROSS-APPELLEES, V. FIAT S.P.A. AND FIAT MOTORS OF NORTH AMERICA, INC., APPELLEES AND CROSS-APPELLANTS.

509 N.W.2d 603

Filed January 7, 1994.   No. S-91-435.

M.J. Bruckner, John V. Hendry, and Michael K. High, of Bruckner, O'Gara, Keating, Hendry, Davis & Nedved, P.C., for appellants.

Gerald L. Friedrichsen, of Fitzgerald, Schorr, Barmettler & Brennan, and George J. Lavin, Jr., and Thomas J. Bradley, of Lavin, Coleman, Finarelli & Gray, for appellees.

HASTINGS, C.J., BOSLAUGH, CAPORALE, FAHRNBRUCH, and LANPHIER, JJ.

LANPHIER, J.

Eugene and Connie Kudlacek brought this product liability action against Fiat S.p.A. and Fiat Motors of North America, Inc. (hereinafter jointly Fiat), as guardians and conservators of their son, Christopher Kudlacek, for injuries sustained by Christopher Kudlacek in an accident in which he was an automobile passenger. Plaintiffs presented evidence to support their claims that (1) the Fiat X1/9 automobile was defectively designed because it did not provide adequate protection for the passengers during a rollover and side-impact collision with an object (crashworthiness claim), (2) the Fiat X1/9 was designed with poor handling stability, and (3) Fiat failed to warn of the handling defect. After the plaintiffs presented their evidence, the defendants moved for a directed verdict. The court granted the motion on the issue of crashworthiness on both negligence and strict liability theories on the basis that there was no evidence of the extent of the enhanced injuries attributable to the alleged defect in the occupant-protection characteristics of the vehicle and no evidence that plaintiffs' alternative design would have resulted in different injuries. The remaining issues were submitted to the jury, and it found for the defendants.

The plaintiffs appeal, and the defendants cross-appeal. Plaintiffs assert the trial court erred (1) in dismissing their crashworthiness claim; (2) in receiving the videotapes of tests conducted on other vehicles; and (3) in submitting to the jury, and improperly instructing it on, the "state-of-the-art" defense. On cross-appeal, defendants assert the trial court erred (1) in overruling the directed verdict on plaintiffs' allegations of strict liability under Neb. Rev. Stat. § 25-21,181 (Reissue 1989), (2) in overruling a motion for directed verdict on grounds of insufficient evidence presented by the plaintiffs, and (3) in permitting plaintiffs' accident reconstruction expert to testify concerning computer simulation of the path of the Fiat X1/9 during the accident. We affirm in part, reverse in part, and remand for further proceedings.

## FACTUAL BACKGROUND

The record presents the following facts: On the evening of September 22, 1980, Christopher Kudlacek was a passenger in a Fiat X1/9 driven by Arlan Broome, Jr. Broome testified they were traveling north on 144th Street, by Dodge Street in Omaha, at a speed between 40 and 55 miles per hour. Broome testified that when he saw an animal crossing the road in front of the vehicle, he turned into the southbound lane to avoid hitting the animal, and lifted his foot off the accelerator. When Broome attempted to steer the vehicle back to the northbound lane, the vehicle began to fishtail. The vehicle remained out of control and ultimately slid sideways off the west side of 144th Street down the embankment of a ditch. Broome could not remember what happened after the vehicle left the road. Reconstruction experts testified that after reaching the bottom of the ditch, the vehicle tripped, rolled upside down, launched itself in the air, and struck a group of trees on Kudlacek's side of the vehicle. Finally, the vehicle rebounded from the trees and came to rest right side up. As a result of the impact to Kudlacek's side of the vehicle, the upper portion of the passenger door was crushed into the passenger compartment approximately 19 inches.

### INJURIES FROM ACCIDENT

Kudlacek sustained several injuries, the most serious of which was a brain injury which left him permanently and totally disabled. Plaintiffs offered the testimony of several medical, as well as automotive, experts to support their claims. Plaintiffs introduced testimony of two doctors who treated Kudlacek on the night of the accident: Dr. Leslie Hellbusch, a neurosurgeon, and Dr. James R. Adwers, who performed abdominal surgery. On the night of the accident, Dr. Hellbusch diagnosed Kudlacek as suffering from several conditions, including a possible cerebral hypoxic injury, an injury to the brain caused by lack of oxygen or lack of blood to carry oxygen to the brain; cervical spine fractures of the middle portion of the back of his neck; pneumomediastinum, air in the chest; right pneumothorax, wherein air leaks outside the lung because of a punctured lung; a possible left-arm fracture and a right-leg

fracture; cuts and scrapes; and an intra-abdominal injury. A basilar skull fracture, which is a crack or fracture in the bone surrounding the brain; a possible cerebral contusion; and a fractured jaw were discovered the following day by Dr. Hellbusch.

On the night of the accident, Dr. Adwers performed emergency abdominal surgery on Kudlacek to determine the source of Kudlacek's bleeding and to control it. During this surgery, Dr. Adwers found approximately 1,500 cubic centimeters of blood in Kudlacek's abdomen, which is approximately three times the amount of blood normally given when a person is donating blood. According to Dr. Adwers, several sources for the bleeding were identified, but the two major sources of the bleeding were a laceration in the dome of the liver and a torn spleen. Dr. Adwers removed the spleen, and the liver injury resolved itself by forming a major blood clot.

Dr. F. Cleveland Trimble testified that the approximately 18-inch intrusion of the automobile's passenger door into Kudlacek's side of the vehicle was a substantial contributing cause of Kudlacek's brain injury because it resulted in a deficient blood flow and a lack of oxygen to Kudlacek's brain.

## AUTOMOTIVE EXPERT TESTIMONY

The plaintiffs also called Harley Copp and William N. Weins, Ph.D., to testify as experts on automotive design and handling. Michael Dickinson was the plaintiffs' reconstruction expert. Dickinson presented a computerized simulation of the Fiat X1/9's path during the accident. Weins and Copp testified that they found the Fiat X1/9 was defective and unreasonably dangerous because it made a rapid transition from understeer to oversteer when the driver lifted his foot off the throttle, during sharp cornering or emergency maneuvering, at or near the car's limit of control, making the vehicle uncontrollable. Understeering and oversteering refer to the handling characteristics of the vehicle. Weins explained that a vehicle which does not turn as much as the driver wants is an understeering vehicle. He further testified that understeering is a feature common among American-built cars. In contrast, an

oversteering vehicle would turn more than a driver would like, and therefore the vehicle will turn more sharply if it is an oversteering vehicle. Weins testified that in a situation in which the driver has lost control in an understeering vehicle, the vehicle will go forward, whereas an oversteering vehicle which is out of the control of the driver will turn sideways or spin.

At the close of the plaintiffs' case, defendants moved for a directed verdict. The court sustained the motion on plaintiffs' claim for crashworthiness on both negligence and strict liability theories, because plaintiffs' evidence was insufficient to establish a causal connection between the alleged defective design and Kudlacek's injuries and because no alternative design had been offered by the plaintiffs.

During their defense, defendants presented the expert testimony of Edward Heitzman, an automotive engineer. Heitzman testified, in part, on several tests conducted on the Fiat X1/9 as well as on other vehicles. Videotapes were made of all the testing performed. Plaintiffs' objections to the introduction of the videotapes showing the testing of the other vehicles were overruled.

At the close of all the evidence, plaintiffs withdrew their negligence claims against defendants, and the remaining issues of handling instability and failure to warn were submitted to the jury, under a theory of strict liability. The instructions to the jury included a state-of-the-art instruction, to which the plaintiffs objected. Further facts will be discussed as they become necessary to an understanding of the issues at hand.

## CRASHWORTHINESS

Plaintiffs allege the court erred in directing a verdict in defendants' favor on the issue of crashworthiness under both negligence and strict liability theories. In a court's review of a directed verdict, the party against whom a motion for a direction of liability is made is entitled to have every controverted fact resolved in his or her favor and to have the benefit of every inference which can reasonably be drawn from the evidence. If there is any evidence which will sustain a finding for the party against whom the motion is made, the case may not be decided as a matter of law. A directed verdict is

proper only where reasonable minds cannot differ and can only draw one conclusion from the evidence. Where reasonable minds may draw different conclusions from the evidence, the question of negligence is for determination by the jury. *Stoco, Inc. v. Madison's, Inc.*, 235 Neb. 305, 454 N.W.2d 692 (1990); *Commerce Sav. Scottsbluff v. F.H. Schafer Elev.*, 231 Neb. 288, 436 N.W.2d 151 (1989); *Raben v. Dittenber*, 230 Neb. 822, 434 N.W.2d 11 (1989).

In products liability, there is a significant distinction between a manufacturer's liability for the manufactured product on account of strict liability in tort, as opposed to liability based on negligence. In a cause of action based on negligence, the question involves the manufacturer's conduct, that is, whether the manufacturer's conduct was reasonable in view of the foreseeable risk of injury, whereas in a cause of action based on strict liability in tort, the question involves the quality of the manufactured product, that is, whether the product was unreasonably dangerous. *Rahmig v. Mosley Machinery Co.*, 226 Neb. 423, 412 N.W.2d 56 (1987).

To recover against the defendant on a claim of strict liability, the plaintiff must prove by a preponderance of the evidence:

> (1) The defendant placed the product on the market for use and knew, or in the exercise of reasonable care should have known, that the product would be used without inspection for defects; (2) the product was in a defective condition when it was placed on the market and left the defendant's possession; (3) the defect is the proximate or a proximately contributing cause of plaintiff's injury sustained while the product was being used in the way and for the general purpose for which it was designed and intended; (4) the defect, if existent, rendered the product unreasonably dangerous and unsafe for its intended use; and (5) plaintiff's damages were a direct and proximate result of the alleged defect.

(Syllabus of the court.) *Rahmig v. Mosley Machinery Co., supra.*

"Unreasonably dangerous" means that the product has a propensity for causing physical harm beyond that which would be contemplated by the ordinary user or consumer who

purchases it, with the ordinary knowledge common to the foreseeable class of users as to its characteristics. *Rahmig v. Mosley Machinery Co., supra*; *Hancock v. Paccar, Inc.*, 204 Neb. 468, 283 N.W.2d 25 (1979).

Crashworthiness cases involve allegations that a defective design in the vehicle made the vehicle unsafe to occupy during a foreseeable collision, and because of this defect the plaintiff's injuries were enhanced. See, *Higginbotham v. Ford Motor Co.*, 540 F.2d 762 (5th Cir. 1976); *Glyn-Jones v. Bridgestone/Firestone, Inc.*, 857 S.W.2d 640 (Tex. App. 1993); *Reed v. Chrysler Corp.*, 494 N.W.2d 224 (Iowa 1992); *Jackson v. Warrum*, 535 N.E.2d 1207 (Ind. App. 1989); *Sumnicht v. Toyota Motor Sales*, 121 Wis. 2d 338, 360 N.W.2d 2 (1984). In *Friedrich v. Anderson*, 191 Neb. 724, 217 N.W.2d 831 (1974), we extended liability for defective design claims to encompass those based on the vehicle's crashworthiness. Relying on *Friedrich*, we later stated in *Hancock v. Paccar, Inc.*, 204 Neb. at 474-76, 283 N.W.2d at 32-33:

> "One who is injured as a result of a mechanical defect in a motor vehicle should be protected under the doctrine of strict liability even though the defect was not the cause of the collision which precipitated the injury. . . . Since collisions for whatever cause are foreseeable events, the scope of liability should be commensurate with the scope of the foreseeable risks."
>
> . . . .
>
> . . . No good reason exists for not applying the doctrine of strict liability to a case where the defective design results in an enhanced injury to the plaintiff even though the product [design] did not cause the initial collision.

Under a theory of crashworthiness, the manufacturer is liable for only that portion of the damages caused as a result of the defective design. Therefore, the plaintiff must show that his injuries were enhanced as a result of the defective design of the vehicle. *Harvey by Harvey v. General Motors Corp.*, 873 F.2d 1343 (10th Cir. 1989); *Huddell v. Levin*, 537 F.2d 726 (3d Cir. 1976); *Larsen v. General Motors Corp.*, 391 F.2d 495 (8th Cir. 1968). This case presents the question of what burden of proof is placed on a plaintiff to prove that the manufacturer's

defective design proximately caused his enhanced injuries.

Two approaches have been taken in determining the plaintiff's burden of proof in establishing that a manufacturer's defective design enhanced the plaintiff's injuries. In some jurisdictions, the plaintiff is required to show the specific injuries attributable to the defective design of the vehicle and present an alternative design which would have prevented those injuries. *Harvey by Harvey v. General Motors Corp., supra*; *Curtis v. General Motors Corp.*, 649 F.2d 808 (10th Cir. 1981) (applying Colorado law); *Stonehocker v. General Motors Corp.*, 587 F.2d 151 (4th Cir. 1978) (applying South Carolina law); *Huddell v. Levin, supra*; *Higginbotham v. Ford Motor Co., supra*; *Dorsett v. American Isuzu Motors, Inc.*, 805 F. Supp. 1212 (E.D. Pa. 1992); *Wernimont v. International Harvester Corp.*, 309 N.W.2d 137 (Iowa App. 1981). Under these theories, the plaintiff must show that the defective design was the sole cause of the plaintiff's enhanced injuries.

Another approach allows the plaintiff to recover where there is an "indivisible" injury, if he presents evidence that shows that the alleged defect was a "substantial factor" in causing the enhanced injuries. See, *Mitchell v. Volkswagenwerk, AG*, 669 F.2d 1199 (8th Cir. 1982) (applying Minnesota law); *Fox v. Ford Motor Co.*, 575 F.2d 774 (10th Cir. 1978) (applying Wyoming law); *Richardson v. Volkswagenwerk, A.G.*, 552 F. Supp. 73 (W.D. Mo. 1982); *Polston v. Boomershine Pontiac-GMC*, 262 Ga. 616, 423 S.E.2d 659 (1992); *Czarnecki v. Volkswagen of America*, 172 Ariz. 408, 837 P.2d 1143 (Ariz. App. 1991); *Jackson v. Warrum, supra*; *Fouche v. Chrysler Motors Corp.*, 103 Idaho 249, 646 P.2d 1020 (Idaho App. 1982), *aff'd* 107 Idaho 701, 692 P.2d 345 (1984). The plaintiff is not required to show the specific injuries he would have received in the absence of the alleged defect or which injuries would have occurred had an alternative design been used. *Id.* In these jurisdictions, the plaintiff need not show that the defective design was the sole cause of the plaintiff's additional injuries. Instead, the defendant is liable if the defective design was a substantial factor in producing the plaintiff's additional injuries. Once proximate cause is established, then the burden is on the defendant to show apportionment of damages. *Id.* However, if

the damages cannot be apportioned, then the defendant manufacturer may be held jointly and severally liable with the defendant responsible for the original collision. *Smith v. Fiat-Roosevelt Motors, Inc.*, 556 F.2d 728 (5th Cir. 1977) (applying Florida law); *Higginbotham v. Ford Motor Co., supra*; *Richardson v. Volkswagenwerk, A.G., supra*.

Defendants claim that plaintiffs failed to show an alternative design which would have resulted in less severe injuries. Nebraska no longer requires proof of an alternative design for a claimant to recover under a claim of defective design. See *Rahmig v. Mosley Machinery Co.*, 226 Neb. 423, 412 N.W.2d 56 (1987). In *Rahmig*, this court overruled *Nerud v. Haybuster Mfg.*, 215 Neb. 604, 340 N.W.2d 369 (1983), to the extent that it required a plaintiff to show an alternative design which would have made the product safer in order to recover in a defective design claim under strict liability and negligence theories. Although *Rahmig* involved a guillotine metal scrap shear, the same general principles apply to a claim of defective design where the design of a vehicle is at issue. For example, the court in *Nerud* relied on a reading of *Hancock v. Paccar, Inc.*, 204 Neb. 468, 283 N.W.2d 25 (1979), to determine that a showing of an alternative design was necessary to establish a claim of product liability. The court suggested that *Hancock*, a case involving an allegedly defectively designed vehicle, hinted that a plaintiff was required to show an alternative design.

Furthermore, in *Hancock v. Paccar*, 204 Neb. at 476, 283 N.W.2d at 33, this court stated that the rule regarding strict liability, as stated in Restatement (Second) of Torts § 402 A, comment *d*. (1965),

> "extends to any product sold in the condition, or substantially the same condition, in which it is expected to reach the ultimate user or consumer. Thus the rule stated applies to an automobile, a tire, an airplane, a grinding wheel, a water heater, a gas stove, a power tool, a riveting machine, a chair, and an insecticide. . . ."

Because of the foregoing discussion, we see no reason why a separate standard of proof should apply to vehicles on claims of defective design.

## PROXIMATE CAUSE IN NEBRASKA

As to proximate causation, we find that the substantial factor standard harmonizes with Nebraska law. In Nebraska, a defendant's negligence is not actionable unless it is the proximate cause of the plaintiff's injuries or is a cause which proximately contributed to them. *Miles v. Box Butte County*, 241 Neb. 588, 489 N.W.2d 829 (1992). The substantial factor test has been used in Nebraska to determine proximate cause. See, *Travelers Indemnity Co. v. Center Bank*, 202 Neb. 294, 275 N.W.2d 73 (1979); *Pendleton Woolen Mills v. Vending Associates, Inc.*, 195 Neb. 46, 237 N.W.2d 99 (1975); *Landmesser v. Ahlberg*, 184 Neb. 182, 166 N.W.2d 124 (1969). In addition, where two causes produce a single indivisible injury, joint and several liability attaches. *Lindgren v. City of Gering*, 206 Neb. 360, 292 N.W.2d 921 (1980); *English v. Bruin Engineering, Inc.*, 201 Neb. 791, 272 N.W.2d 753 (1978); *Zavoral v. Pacific Intermountain Express*, 181 Neb. 40, 146 N.W.2d 796 (1966). If the effects of a defendant's negligence actively and continuously operate to bring about harm to another, the fact that the active negligence of a third person is also a substantial factor in bringing about the harm does not protect the defendant from liability; furthermore, if the separate and independent acts of negligence by different persons combine to produce a single injury, each participant is liable for the damage, although one of them alone could not have caused the result. *Miles v. Box Butte County, supra.*

## KUDLACEKS' BURDEN OF PROOF

The trial court granted a directed verdict after finding that plaintiffs' evidence was insufficient as a matter of law to establish a causal connection. Specifically, the trial court stated:

> [T]here is no evidence to show the actual extent of the enhanced injuries attributable to the alleged defect in the design of the occupant protection — protective characteristics.
>
> Furthermore, that there is no evidence that had the plaintiffs' alternative design of occupant protective characteristics been on the vehicle, the injury outcome would have been any different.

Using the substantial factor test, we find there was sufficient evidence to submit the issue of crashworthiness to the jury. As stated, in a court's review of a directed verdict, all controverted facts must be construed in favor of the party against whom the verdict was entered. *Raben v. Dittenber*, 230 Neb. 822, 434 N.W.2d 11 (1989). Dr. Trimble testified as to the causal relationship between the 18½-inch intrusion of the vehicle's passenger door and the injuries sustained by Kudlacek. According to Dr. Trimble's testimony, the implosion caused a blunt injury which affected multiple systems in Kudlacek's body. The injuries, such as those of the liver and spleen, caused a diminished blood flow to the brain and were a substantial contributing cause of Kudlacek's brain injury. Dr. Adwers lent support to Dr. Trimble's testimony. He testified that the cause of the ruptured spleen and the laceration on the dome on the right side of the liver was a direct trauma to the spleen or liver from the ribs. He explained that a rib is flexible enough to bend far back enough to tear the liver and spleen in the same manner in which Kudlacek's was torn. Dr. Adwers further explained that because there was no external puncture, he concluded that either a rib fracture or rib compression caused the injuries to the liver and spleen.

Plaintiffs also offered the testimony of Copp, who testified as to the crashworthiness claim set forth by the plaintiffs. According to Copp's testimony, the Fiat X1/9 was unreasonably dangerous because the fiberglass roof, which served only as a wind or rain cover, resulted in excessive deformations in the passenger door.

Copp also testified regarding an alternative design. However, as this court has abandoned this element as part of the plaintiff's burden of proving defective design, we do not discuss it.

## ADMISSION OF VIDEOTAPES

A substantial number of tests were conducted in preparation for the trial of this action. Out of many hours of testing videotape, short selections were made by Heitzman, the defendants' automotive expert, to highlight the results of the various tests. The plaintiffs contend that the defendants failed

to establish proper foundation for the introduction of three videotapes which showed the handling and steering tests performed by Heitzman on a Fiat X1/9 and several other vehicles.

In all proceedings where the Nebraska Evidence Rules apply, admissibility of evidence is controlled by the Nebraska Evidence Rules, not judicial discretion, except in those instances under the Nebraska Evidence Rules when judicial discretion is a factor involved in admissibility of evidence. *Petska v. Olson Gravel, Inc.*, 243 Neb. 568, 500 N.W.2d 828 (1993). This court reviews a trial court's ruling on the admissibility of evidence for an abuse of discretion where the Nebraska Evidence Rules permit judicial discretion in assessing admissibility. *Behm v. Northwestern Bell Tel. Co.*, 241 Neb. 838, 491 N.W.2d 334 (1992). Evidence relating to an illustrative experiment is admissible if a competent person conducted the experiment, *an apparatus of suitable kind and condition was utilized*, and the experiment was conducted fairly and honestly. *Kluender v. Mattea*, 214 Neb. 327, 334 N.W.2d 416 (1983); *Shover v. General Motors Corp.*, 198 Neb. 470, 253 N.W.2d 299 (1977). The trial court has wide discretion in determining whether evidence relating to illustrative experiments should be received. A judgment will not be reversed on account of the admission or rejection of such testimony unless there has been a clear abuse of discretion. *Id.*

When defendants questioned Heitzman about the results of the tests of the other vehicles, plaintiffs objected for lack of foundation with respect to comparative testing. See *id.*

Plaintiffs cite *Kluender* and *Shover* in support of their position. This reliance is misplaced. *Kluender* and *Shover* involved foundational questions where the videotape attempted to re-create the accident conditions. Other jurisdictions have found that where the videotape is offered not to re-create conditions similar to the accident, but merely to illustrate certain principles, differences in surrounding conditions are less relevant and do not require the videotape's exclusion. See, *Gilbert v. Cosco Inc.*, 989 F.2d 399 (10th Cir. 1993); *Four Corners Helicopters, Inc. v. Turbomeca, S.A.*, 979 F.2d 1434 (10th Cir. 1992); *Dorsett v. American Isuzu Motors, Inc.*, 805 F.

Supp. 1212 (E.D. Pa. 1992) (admissible even if no similarity because difference in conditions so obvious, there is no danger of confusing the jury); *Loevsky v. Carter*, 70 Haw. 419, 773 P.2d 1120 (1989) (videotapes inadmissible as a veiled attempt at re-creation); *Zolber v. Winters*, 109 Idaho 824, 712 P.2d 525 (1985); *Gorelick v Dep't of Highways*, 127 Mich. App. 324, 339 N.W.2d 635 (1983); *Green v General Motors Corp*, 104 Mich. App. 447, 304 N.W.2d 600 (1981) (videotape served as a visual aid); *Hueper v. Goodrich*, 263 N.W.2d 408 (Minn. 1978) (videotape admissible where purpose was not to portray area or conditions of accident). Other courts have allowed the videotape as an illustration where the judge has told the jury that the videotape is only a visual illustration and not proof. See, *Harvey by Harvey v. General Motors Corp.*, 873 F.2d 1343 (10th Cir. 1989); *Palmer by Diacon v. Farmers Ins. Exchange*, 233 Mont. 515, 761 P.2d 401 (1988). When allowing videotapes to be shown, courts have found the lack of similarity to go to the weight of the evidence rather than to its admissibility. See, *Gilbert v. Cosco Inc., supra*; *Four Corners Helicopters, Inc. v. Turbomeca, S.A., supra*; *Kramer v. J.I. Case Mfg. Co.*, 62 Wash. App. 544, 815 P.2d 798 (1991) (involving videotape of backhoe).

It is clear that Heitzman's videotapes were not meant to re-create the accident, but merely to rebut the plaintiffs' contention that the Fiat X1/9 was unique in its tendency to spin when the throttle was taken off as it reached its limits of handling.

Heitzman described his work as measuring, defining, and describing automobile handling. He addressed several questions regarding the handling characteristics of the Fiat X1/9. One question was whether the Fiat X1/9 handled differently from other cars in normal maneuvers at 45 to 65 miles per hour.

In order to answer this question, Heitzman developed several questions to be answered by the testing conducted at the Transportation Research Center (TRC):

Q. This testing which you did at TRC, what was it designed — what questions was it designed to answer?

A. Well, the first question was will all these cars spin in

liftoff — when you acc- — at the ragged edge of their capabilities of — of their limit.

If you lift off, will they — will they spin out?

Second question is if they're not at the limit of their capabilities, will they spin out?

Q. Uh-huh.

A. The third question is how do — how do they compare in — in their — in their understeer behavior — the transient understeer behavior?

Q. Uh-huh.

A. And then just comparison. We were trying to compare the six cars, and as a — to — to see if any of them differed much from any of the others or if they were all pretty much the same in performance.

A series of tests was done on the Fiat X1/9 and other vehicles at the TRC on June 20, 21, 29, and 30, 1990. Heitzman testified that Weins, plaintiff's automotive expert, was present during the testing on these dates. Heitzman testified that he was the driver in all of the tests and that in addition to the Fiat X1/9, he tested a 1984 Fiero with a four-cylinder engine, a 1987 Fiero GT with a six-cylinder engine, a 1987 IROC Z Camaro, a 1975 Pontiac Trans Am, and a 1979 Datsun 280ZX. A Subaru wagon was also tested, but the results were incomplete due to a malfunction of the vehicle. The results for the Trans Am were also incomplete. The 1984 Fiero was tested because Weins had tested it previously. The 1987 Fiero was tested because it was the latest development by General Motors of the mid-engine concept. The 280ZX and the Trans Am were considered by Heitzman to be high-performance contemporaries of the Fiat X1/9 and were owned by the Broome family. The IROC Z was tested because it was a state-of-the-art V-8 front-engine, rear-drive sedan. In general, these vehicles were chosen because they were all high-performance, sporty vehicles designed to have a larger than usual performance limit as compared with six-passenger vehicles or sedans.

The following tests were performed on the Fiat X1/9 as well as on the other vehicles: a constant radius test, a step response test, a lane change test, and a frequency response test. The constant radius test consists of driving around a circle and

constantly increasing speeds and measuring steering wheel angle changes to determine the understeer gradient or the amount of understeer. This test requires increasing the speed of the vehicle until it reaches its limit of control. Since the limits of each vehicle are different, the speed of each vehicle was different. The frequency response test measures the sensitivity of the car insofar as how much it turns when the steering wheel is turned, and the response time. This test was conducted on the Fiat X1/9 at the research runway of the aerospace mechanical science department at Princeton University at the end of 1988. The testing surface at Princeton, as well as the surface at the TRC, was asphalt. The testing surface for the TRC was also very flat and smooth. In a step response test, the vehicle is driven in a straight line at 50 miles per hour and the driver puts in increasing steer until the car's limit of control is reached. The test was performed on all vehicles, with the throttle on and the throttle off, and with the same rate of turn of 200 to 500 degrees per second. The speed at which the vehicles were tested was the same, 50 miles per hour.

To address the foundation question, defense counsel asked Heitzman if the same test protocol was used for each vehicle, if the instrumentation was the same, and if the same surface, same driver, and the same analysis method were used. He was also asked whether the data recordation methodology was the same. Each car was subjected to constant radius tests with drop throttle and no drop throttle. Each vehicle did the J-turn-type testing (step response test with and without throttle). Heitzman testified that the same speeds were used for most of the tests. However, in the constant radius test, he explained, the object is to reach the vehicle's limit and see if it spins when it reaches its limit. Since the limit of control is different for each vehicle, it would be reached at different speeds.

On voir dire, Heitzman conceded that some of the vehicles tested were front-engine vehicles and some were mid-engine vehicles, and the size and pressure of the tires would also vary. Nevertheless, the purpose of the testing was to demonstrate the principle that the Fiat X1/9 reacted similarly to other high-performance vehicles when they reached their limits. The dissimilarity of the test conditions to the accident conditions

would go to the weight of the evidence and not to its admissibility. *Gilbert v. Cosco Inc.*, 989 F.2d 399 (10th Cir. 1993); *Four Corners Helicopters, Inc. v. Turbomeca, S.A.*, 979 F.2d 1434 (10th Cir. 1992); *Champeau v. Fruehauf Corp.*, 814 F.2d 1271 (8th Cir. 1987).

In *Gilbert*, the defendant introduced tests to refute testimony by the plaintiffs' expert that defendant's design had caused a "springboard effect" in the child-restraint seat manufactured by the defendants. The appellate court stated that when experiments do not simulate actual events at issue, the jury should be instructed that the evidence is admitted for the limited purpose or principles. No limiting instruction was given to the jury. However, the court upheld the admission of the tests because the trial court heard testimony regarding the purpose of the tests, it considered arguments by both sides and the relevancy of the data, and it allowed the plaintiffs' attorney to question the expert to determine relevancy and prejudicial impact. The appellate court also found the credibility of the expert's conclusions was attacked by the plaintiffs' attorney's pointing out inconsistencies and that the jury could consider this in weighing the evidence.

No limiting instruction was provided for the jury in the case before us. However, the trial court also heard testimony regarding the purposes of the tests conducted on the other vehicles. Defendants advised the court that inferences had been created by plaintiffs' expert that if a vehicle spins, it is defective, and that the Fiat X1/9 spins more quickly than American cars. The tests therefore were introduced to show that all cars will start to spin when they reach their limit of control. Plaintiffs' counsel was also able to question Heitzman on the differences in vehicles before the jury. Through this questioning the jury could determine how much weight to give the tests.

Under these circumstances, we cannot say that the trial court abused its discretion in admitting the videotapes depicting tests run on vehicles other than the Fiat X1/9.

## JURY INSTRUCTIONS

### STATE-OF-THE-ART DEFENSE

The plaintiffs next allege that the trial court erred in

submitting the state-of-the-art defense to the jury and in failing to properly instruct the jury on this defense.

Submission of an issue on which the evidence is insufficient to sustain an affirmative finding is generally prejudicial and results in a new trial. *Vredeveld v. Clark, ante* p. 46, 504 N.W.2d 292 (1993).

Contrary to the allegations of the plaintiffs, the defendants did offer evidence that the Fiat X1/9 was in conformity with the technology reasonably available at the time. Heitzman testified that the Fiat X1/9 met the specifications concerning oversteer and understeer of the "research safety vehicle," an idealized car with optimized safety for the 1980's. Michael Pocobello, an automotive engineer and defendants' expert, testified that the margin of safety that the Fiat X1/9 provides a driver in terms of handling capability was at the top of the technology for that period in which the Fiat X1/9 was manufactured. He also stated that the Fiat X1/9 was "on the top of the heap" as to technology available in the late seventies. Testimony by these experts provided a sufficient basis to submit the state-of-the-art defense to the jury.

### TENDERED INSTRUCTIONS

Plaintiffs' second contention concerning the jury instructions is that the trial court improperly instructed the jury on the state-of-the-art defense. This court has stated that all the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating a reversal. See *Kozeny v. Miller*, 243 Neb. 402, 499 N.W.2d 75 (1993).

We find no merit in this assignment. Neb. Rev. Stat. § 25-21,182 (Reissue 1989) states:

> In any product liability action based upon negligent or defective design, testing, or labeling, proof establishing that such design, testing, or labeling was in conformity with the generally recognized and prevailing state of the art in the industry at the time the specific product involved in the action was first sold to any person not engaged in the business of selling such product shall be a defense. State of

the art as used in this section shall be defined as the best technology reasonably available at the time.

The challenged jury instruction incorporates almost verbatim the burden placed on the defendants to establish a state-of-the-art defense under § 25-21,182. It requires the defendants prove that the design of the Fiat X1/9 "conformed with the generally recognized and prevailing state of the art at the time that it was first sold by the defendants in 1980." It also defines, as does § 25-21,182, "state of the art" as "the best technology reasonably available at the time."

Plaintiffs argue that the instruction failed to make the distinction between state of the art and the standard of the industry. Plaintiffs rely on *Hancock v. Paccar, Inc.*, 204 Neb. 468, 479-80, 283 N.W.2d 25, 35 (1979), wherein we stated:

> While the jury may consider, as evidence of the state of the art, the fact that no manufacturer is doing that which it is claimed could be done, such evidence will not establish conclusively the state of the art. Obviously, the inaction of all the manufacturers in an area should not be the standard by which the state of the art should be determined. Whether the design represents the state of the art is still a question of fact to be determined by the jury.

*Hancock* did not involve a challenge to the jury instruction, but the propriety of submitting the issue to the jury. The challenged instruction in this instance clearly states that state of the art refers not to the technology the manufacturers are employing, but to "the best technology reasonably available at the time." Plaintiffs' assertion to the contrary is mistaken.

## CROSS-APPEAL

On cross-appeal, the defendants assert the trial court erred (1) in overruling their motion for a directed verdict on plaintiffs' strict liability claim against Fiat Motors of North America and (2) in permitting plaintiffs' accident reconstruction expert to testify concerning a computer simulation of the path of the Fiat X1/9 on the roadway.

### DIRECTED VERDICT

At the close of plaintiffs' case, defendant Fiat Motors of North America, Inc., moved for a directed verdict on plaintiffs'

claims based on strict liability. The trial court denied the motion. Defendants claim that § 25-21,181 bars any action based on strict liability against the seller unless the seller is also a manufacturer.

Section 25-21,181 states:

> No product liability action based on the doctrine of strict liability in tort shall be commenced or maintained against any seller or lessor of a product which is alleged to contain or possess a defective condition unreasonably dangerous to the buyer, user, or consumer unless the seller or lessor is also the manufacturer of this product or the part thereof claimed to be defective.

Plaintiffs assert that Fiat Motors of North America was a manufacturer for purposes of a strict liability suit. After the plaintiffs presented their case, they were granted leave to amend their third amended petition to include allegations that at the time of the accident, Fiat Motors of North America was a wholly owned subsidary of Fiat S.p.A., the car manufacturer, and that Fiat Motors of North America was the sole importer and distributor of Fiat S.p.A. Plaintiffs claim these allegations are sufficient to find Fiat Motors of North America liable as a manufacturer.

Plaintiffs' claim fails for two reasons. At trial, plaintiffs failed to set forth any evidence which would support these allegations. Plaintiffs claim that Fiat Motors of North America stipulated to the aforementioned allegations. No such stipulation could be found in the record. At the time of the request for leave to amend, plaintiffs' counsel read the proposed amendment to the petition. Fiat Motors of North America did not object to the amendment. Plaintiffs cite Fiat Motors of North America's lack of objection at the time the plaintiffs requested to amend their third petition as amounting to a stipulation to such allegations. This contention is not supported by the record.

In any event, § 25-21,181 bars any action based on strict liability in tort brought against the seller or lessor of a defective or unreasonably dangerous product unless the seller is also the manufacturer of the product. Because the plaintiffs failed to present evidence establishing Fiat Motors of North America as

a manufacturer of the defective product, Fiat Motors of North America was entitled to a directed verdict on the issue of strict liability.

COMPUTER SIMULATION

Defendants next complain that plaintiffs' expert's testimony regarding a computer simulation of the path of the Fiat X1/9 on the roadway was erroneously admitted. Evidence relating to an illustrative experiment is admissible if a competent person conducted the experiment, an apparatus of suitable kind and condition was utilized, and the experiment was conducted fairly and honestly. *Kluender v. Mattea*, 214 Neb. 327, 334 N.W.2d 416 (1983); *Shover v. General Motors Corp.*, 198 Neb. 470, 253 N.W.2d 299 (1977). It is not essential that conditions existing at the time of the experiment be identical with those existing at the time of the occurrence. Substantial similarity is sufficient. *Id.*

Other jurisdictions have permitted the use of computer ·simulations to aid the trier of fact. See, *Perma Research and Development v. Singer Co.*, 542 F.2d 111 (2d Cir. 1976), *cert. denied* 429 U.S. 987, 97 S. Ct. 507, 50 L. Ed. 2d 598; *Commercial Union Ins. Co. v. Boston Edison Co.*, 412 Mass. 545, 591 N.E.2d 165 (1992); *Messex v. Louisiana Department of Highways*, 302 So. 2d 40 (La. App. 1974). In *Commercial Union Ins. Co. v. Boston Edison Co.*, 412 Mass. at 549, 591 N.E.2d at 168, the court conditioned the use of computer simulations on several factors:

> [W]e treat computer-generated models or simulations like other scientific tests, and condition admissibility on a sufficient showing that: (1) the computer is functioning properly; (2) the input and underlying equations are sufficiently complete and accurate (and disclosed to the opposing party, so that they may challenge them); and (3) the program is generally accepted by the appropriate community of scientists.

We find the simulation meets the requirements necessary to be admissible evidence. Dickinson, the plaintiffs' accident reconstruction expert, generated the simulation of the accident through a computer program called Engineering Dynamics Single Vehicle Simulator. Dickinson testified that this program

or model is used regularly by members of the reconstruction group company Failure Analysis Associates, possibly the largest failure analysis firm in the world, and is generally relied upon by experts in the reconstruction field for single-vehicle accident simulation. He also stated the program is used either to reconstruct an entire accident or to evaluate driver-vehicle interaction prior to an impact with an object or another car.

Dickinson described the authentication process used with this model. The dimensions of the Fiat X1/9 were measured in order to accurately represent the various dimensions that were to be input into the model. Those dimensions which were not available through direct measurement, such as the steering angle input and acceleration, were taken from the input data from the track tests as reported by Weins and Heitzman.

Track test data was used by Dickinson for verification purposes. Dickinson compared the J-turn and the constant radius skid-pad tests track tests performed by Weins and Heitzman, respectively, to the computer simulation of those tests in order to have an independent validation of the computer model. These simulations were done to validate the computer model, which was developed through measurement of vehicle properties and comparison to track test data, to show that in an off-throttle step-steer type maneuver, the computer model accurately represents the vehicle, the Fiat X1/9. Once the computer model is validated, an accurate simulation of the accident may be achieved.

In order to simulate the accident, Dickinson testified, he ran simulations using the model developed to compare the track test of the vehicle on the roadway, which allowed him to review the vehicle behavior and the vehicle trajectory and compare those to the marks on the roadway, the road exit speed, the angle at which the vehicle left the roadway, and the elements Broome described to him.

Fiat argues that the simulation was invalid because it was based on actions by Broome that were contrary to Broome's testimony and on factual assumptions which had no support in the evidence. Specifically, Fiat argues that the simulation is invalid because Broome testified that he thought he downshifted and that he attempted to brake at the time of the

accident, and those elements were not placed in the computer simulation. We disagree. Broome testified that he thought he had downshifted and that he tried to apply the brakes but was unsure he had succeeded in doing either.

Dickinson explained his decision to not use those elements in the simulation by stating that a reconstructionist evaluates the witnesses' or driver's testimony against the physical evidence and against the simulation. The control elements were developed through runs of the simulation and were performed to best match the physical data that was available from the accident, which included the marks on the road, the road exit speeds, the angle exiting the road, and Broome's testimony of swerving to miss the animal on the road, lifting his foot off the accelerator, and attempting to steer back into his lane. Dickinson explained the simulation did not include braking because there was no evidence on the roadway that Broome succeeded in applying the brakes. Under these circumstances, we find the simulation accurately reflected the accident and was therefore correctly admitted by the trial court.

## CONCLUSION

We find the trial court erred in sustaining the defendants' motion for a directed verdict on the issue of crashworthiness. We further find the trial court did not abuse its discretion in admitting the videotapes of the several vehicles. On the cross-appeal, we find that the trial court erred in not granting a directed verdict for Fiat Motors of North America. Finally, we find the trial court was correct in admitting the testimony and videotape on the computer simulation of the accident. We reverse, and remand the cause for further proceedings consistent with this opinion.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.

WHITE and SHANAHAN, JJ., not participating.