STOCO, INC., A NEBRASKA CORPORATION, APPELLANT AND CROSS-APPELLEE, V. MADISON'S, INC., A NEBRASKA CORPORATION, APPELLEE AND CROSS-APPELLANT.
454 N.W.2d 692

Filed May 11, 1990.    No. 88-437.

John M. Gerrard, of Domina, Gerrard, Copple & Stratton, P.C., for appellant.

Michael T. Brogan, of Brogan & Stafford, P.C., and Terry R. Wittler, of Cline, Williams, Wright, Johnson & Oldfather, for appellee.

BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

BOSLAUGH, J.

The plaintiff, Stoco, Inc., filed this action against the defendant, Madison's, Inc., seeking damages for the loss of its 1985 barley crop as a result of the defendant's alleged negligence and breach of warranty in applying agricultural chemicals and fertilizer to certain fields farmed by the plaintiff.

The second amended petition alleged that Madison's was negligent (1) in applying dry urea fertilizer on four of the plaintiff's barley fields during March and April 1985, causing streaking and resulting crop loss, and (2) in applying 2,4-D herbicide on May 28, 1985, on three of the plaintiff's barley fields. The plaintiff also alleged that the defendant breached its implied warranty of fitness in that the 2,4-D herbicide was not fit for use on the barley crop at the May 28, 1985, stage of growth, and the use of the herbicide was not accompanied by reasonable warning concerning potential damage when used at a late stage of plant growth.

In its answer, the defendant denied that it sold the 2,4-D herbicide to the plaintiff and alleged it acted as the plaintiff's agent in purchasing the herbicide from Richard Poland, who sprayed three of the barley fields with 2,4-D on May 28, 1985. The defendant further alleged that the plaintiff was contributorily negligent in failing to use ordinary care (1) in heeding the defendant's warning regarding the timing of the 2,4-D herbicide application and (2) to properly manage and

monitor the growth and development of the barley crop so as to make reasonable farming decisions. The defendant also alleged that the plaintiff failed to avoid the consequences of any uneven distribution of fertilizer by not applying additional fertilizer in late May or early June 1985, upon learning of a possible streaking problem.

After the plaintiff's rest, the trial court sustained the defendant's motions for directed verdict on the issues of breach of implied warranty of merchantability of the fertilizer and herbicide and breach of implied warranty of fitness regarding the fertilizer.

The jury returned a verdict in favor of the defendant and the plaintiff's motion for judgment notwithstanding the verdict and alternative motion for new trial were denied. The plaintiff has appealed and contends that the district court erred in (1) instructing the jury on the issue of contributory negligence regarding the application of fertilizer and herbicide to the barley fields, (2) instructing the jury on the issue of mitigation of damages, (3) failing to direct a verdict in favor of the plaintiff, and (4) finding that the jury's verdict was substantiated by the evidence.

The defendant has cross-appealed, contending the district court erred in failing to direct a verdict in favor of the defendant regarding liability on the fertilizer cause of action.

With respect to the plaintiff's first and second assignments of error, the plaintiff's brief does not specify the jury instructions actually complained of. Although the bill of exceptions shows that the plaintiff objected to proposed instructions Nos. 3, 4, and 7, the instructions which were given to the jury are not included in the record.

Neb. Ct. R. of Prac. 4A(2) (rev. 1989) provides that the appellant shall direct the clerk of the court "to include in the transcript such additional parts of the record as he or she shall specify in the praecipe, *including the instructions given by the trial court, if the appellant intends to assign error in the giving of any instruction . . . .*" (Emphasis supplied.) The record shows that the appellant did not direct the clerk to include the jury instructions in the transcript.

"It is incumbent on the party appealing to present a record

which supports the errors assigned, and absent such a record, the decision of the lower court should be affirmed." *GFH Financial Serv. Corp. v. Kirk*, 231 Neb. 557, 561, 437 N.W.2d 453, 456 (1989); *Howard v. Howard*, 234 Neb. 661, 452 N.W.2d 283 (1990). See, also, *Chalupa v. Chalupa*, 220 Neb. 704, 371 N.W.2d 706 (1985). We therefore do not consider the plaintiff's assignments of error pertaining to alleged errors in instructing the jury.

The remaining issues are whether the trial court erred in failing to direct a verdict in favor of the plaintiff and in overruling the plaintiff's motion for judgment notwithstanding the verdict.

At the close of all the evidence the plaintiff moved for a directed verdict on the issue of the defendant's negligence in applying fertilizer and herbicide to the fields in question. When a motion for a directed verdict made at the close of all the evidence is overruled by the trial court, this court's review is controlled by the rule that a directed verdict is proper only where reasonable minds cannot differ and can draw but one conclusion from the evidence, and the issues should be decided as a matter of law. *Commerce Sav. Scottsbluff v. F.H. Schafer Elev.*, 231 Neb. 288, 436 N.W.2d 151 (1989). The party against whom a motion for directed verdict is made is entitled to have every controverted fact resolved in his or her favor and to have the benefit of every inference which can reasonably be drawn from the evidence. If there is any evidence which will sustain a finding for the party against whom the motion is made, the case may not be decided as a matter of law. *Id.*

Similarly, on a motion for judgment notwithstanding the verdict, the moving party is deemed to have admitted as true all the material evidence admitted which is favorable to the party against whom the motion is directed. The party against whom the motion is directed is entitled to the benefit of all proper inferences which can be deduced therefrom. A jury verdict will not be disturbed unless clearly wrong. *Id.*

The record shows that Brock Stoltenberg was the president of the plaintiff corporation, which was engaged in general farming and the production of barley. Stoltenberg's primary education and training were in the fields of accounting and

computer operations. After 10 years of employment with Mutual of Omaha, Stoltenberg decided to become a full-time farmer in 1982. Stoltenberg's experience with barley began in 1983 when he raised a 10-acre garden plot in the Missouri River "pocket area" of South Dakota, which barley he raised for goose feed. In 1984, he increased his barley production to 75 acres.

In 1985, Stoltenberg decided to plant several hundred acres of barley on rented land in Brown County, Nebraska. The four parcels of land that were the subject of this action are referred to in the record as Kinney Field No. 2, Leach Field No. 3, Leach Field No. 4, and Leach Field No. 5. No crops had been planted the previous crop year on Leach Fields Nos. 3, 4, and 5. Kinney Field No. 2 had been partially planted with alfalfa.

The defendant corporation was engaged in the business of selling agricultural chemicals and fertilizer in Ainsworth, Nebraska. When George Madison, the owner of Madison's, contacted Stoltenberg in February 1985 to solicit Stoco's fertilizer business, Stoltenberg decided to purchase fertilizer from Madison's.

In the third week of February 1985, Stoltenberg and John Ferguson, an agronomist employed by Madison's, visited each of the fields to take soil samples. After soil testing was completed, Ferguson and Madison made suggestions and recommendations to Stoltenberg as to the manner and amounts of fertilizer to be applied.

Madison testified that his company was not made aware that Stoltenberg intended to grow barley until the time the fertilizer recommendations were made, and that Stoltenberg merely said to send the soil samples in to the laboratory " 'for corn or small grain.' " Stoltenberg did not tell Madison's at this time that he had set a yield goal of 140 bushels of barley per acre.

Madison's advised Stoltenberg that he could use either dry urea or a liquid fertilizer. George Madison recommended that liquid fertilizer be applied because the dry urea might cause streaking if wind conditions were unfavorable. Madison also observed that dry urea did not blend well with other additives because the weights of the materials were different, which would cause an uneven distribution of the nitrogen. Stoltenberg

wanted to keep the cost of the fertilizer to around $20 per acre. Since the liquid fertilizer was apparently more expensive than dry urea, Stoltenberg chose to apply dry urea and additives. Ferguson testified that 92 pounds of nitrogen were actually applied to each acre, and that recommendation was primarily based on the plaintiff's cost requirements.

An employee of Madison's applied dry urea fertilizer to the fields in late March or early April 1985. There is evidence that Stoltenberg urged Madison's to complete the fertilization process so that disking and planting could continue, even when the wind was too strong. In early April 1985, the plaintiff planted the four fields with certified barley seed.

In addition to the rainfall in Brown County in the spring and summer of 1985, the plaintiff placed approximately 22 inches of water on each field by pivot irrigation throughout the growing season. Although the plaintiff claims that the irrigation and care of the barley crop were in accordance with good farming practices, there is evidence that the fields were kept too dry during the growing season. Stoltenberg admitted that there were a number of times when the pivot irrigation systems were stopped because of mechanical problems, including engine breakdowns.

There was testimony that the plaintiff's attempt to raise barley in the Nebraska Sandhills country was a first of its kind. Dr. Everett J. Dennis, a certified professional agronomist, crop scientist, and soil scientist with considerable agricultural experience in the Sandhills area, testified that in his expert opinion, barley should not be planted in acid soils. There is evidence that the soil in the four fields was mildly to extremely acid.

In late April 1985, Stoltenberg noticed grass and weed infestation in the barley fields. Ferguson and Stoltenberg discussed the weed situation in February 1985 and again in April 1985. Stoltenberg testified he advised Ferguson that weeds were not his expertise and that he expected Madison's to take care of any weed problems with appropriate recommendations and application of herbicide. George Madison testified, however, that "Mr. Stoltenberg gave us the impression that he knew as much about [herbicides] as we did."

Stoltenberg did not have a management contract with Madison's and did not pay separate consulting or management fees to the defendant.

During their discussions, Ferguson suggested that the plaintiff could use Buctril herbicide. Stoltenberg was familiar with Buctril, having used it on his South Dakota barley the previous crop year, but selected the less expensive 2,4-D herbicide. There is evidence that Buctril, although more expensive, does not cause as much damage to the growing crop as 2,4-D.

Madison's used a ground floater to apply 2,4-D to Kinney Field No. 2 on about May 18, 1985, and Stoco made no claim for yield loss due to 2,4-D damage on that field. The barley was taller in the three Leach fields (which had been planted before the Kinney field), so Stoltenberg decided to go with an aerial application of 2,4-D on those fields.

Although Madison's was not in the aerial application business, it provided the courtesy of finding an aerial applicator for Stoco so that the applicator and the customer could "make their own deals." On May 15, 1985, Madison's began contacting aerial sprayers to apply herbicide to the barley in Leach Fields Nos. 3, 4, and 5.

In mid-May, Madison's contacted Larry Ebert, who said he would apply 2,4-D to the Leach fields for $4.90 per acre. The growth stage of the barley as of May 15 was such that 2,4-D could be safely applied. Stoltenberg admitted that if he had chosen to employ the Ebert Flying Service, he would likely have had no 2,4-D problem, but he did not want to pay $4.90 per acre. Stoltenberg asked Madison's to see if they could get a better price.

After making other calls, George Madison contacted Richard Poland of Sargent, Nebraska, on May 17. Poland stated that he needed to know the exact chemical and rate of application before quoting a price.

George Madison contacted Poland again on May 22. During that conversation, he and Poland discussed a possible rate of application of 2,4-D. Poland asked Madison's to check the growth stage of the crop, which Ferguson did, finding the stage still appropriate on May 22 for 2,4-D application. Poland

quoted a price on May 23 or 24 and arrangements were made for Poland to spray the fields. Poland did not purchase the 2,4-D which he used from Madison's.

Due to some delays, including equipment failure and wind conditions, Poland did not apply the herbicide to Leach Fields Nos. 3, 4, and 5 until May 28. Madison's provided a water tank and Ferguson provided flagging services for Poland, but Madison's was not paid for these items.

Prior to the aerial application of 2,4-D on the three Leach fields, Ferguson contacted Stoltenberg and said that he (Ferguson) was getting concerned that if the spraying was further delayed, " 'we may be getting late.' " Stoltenberg directed Ferguson to just " '[g]et her done.' " Ferguson testified that he checked the growth stage of the crop on May 28 and saw that it would be coming into the early boot stage in another few days. Stoltenberg admitted that he could have decided not to apply the 2,4-D in late May, but realized the weeds would have reduced his yield anyway.

Within 4 or 5 days after the 2,4-D had been applied, Stoltenberg contacted Madison's because things out at the Leach fields did not appear to be right. Stoltenberg later contacted Madison's in person. Poland and Madison had telephone conversations on June 4 and 6, 1985, regarding a perceived problem in the Leach fields.

Poland inspected the crop on June 7. He observed a curling effect on the weeds in the Leach fields and noticed that some bottom leaves of selected barley plants were yellowing. He testified, however, that the crop was not damaged from the 2,4-D.

In June 1985, Madison's asked for Stoltenberg's permission to allow an agronomist to examine the fields. Stoltenberg would allow the agronomist to go on the field only if Madison's first agreed to stipulate that Stoco had "beautiful" barley fields before they were sprayed with 2,4-D.

The plaintiff raised the barley crop to maturity in each of the four fields and obtained average yields of 65.75 bushels per acre on Kinney Field No. 2, 9.8 bushels per acre on Leach Field No. 3, 20.05 bushels per acre on Leach Field No. 4, and 22.9 bushels per acre on Leach Field No. 5.

Dr. Dennis, who testified for the defendant, used photographic evidence, weather bureau statistics, soil tests, and admissions made by the plaintiff to establish several factors contributing to Stoco's yield showing. The photographs of the fields were taken on June 11, 1985. Dr. Dennis noted a "poor stand" in the fields, that is, a lower than normal population of plants per acre. He testified that poor stand might be caused by dryness during germination time, wind, and blowouts while the plants were small. Dr. Dennis noted that barley should not be planted in acid soils and that the soils in question were extremely acid.

Dr. Dennis also observed symptoms of barley yellow dwarf virus in many of the photographs, as well as dry soil. He testified that a plant pathologist from the University of Nebraska had inspected the fields and reported the presence of barley yellow dwarf virus in the fields. This disease would cause a rather severe stunting of the plants, but had nothing to do with fertilization or herbicides. The photographs of the Stoco fields also showed damage due to aphids. Dr. Dennis observed in the photographs "none of the typical crinkling of the flag leaf, nor the crinkling of the awns . . . that is common with 2,4-D damage."

Based on materials compiled by the University of Nebraska Extension Service and other sources of information, Dr. Dennis concluded that barley may be sprayed with 2,4-D through the early boot stage of plant development and that the Stoco barley was in an acceptable stage for aerial application of 2,4-D when it was sprayed. Dr. Dennis found no evidence of 2,4-D damage as of June 11, 1985.

Dr. Dennis stated that the photographs of Kinney Field No. 2 indicated there was a streaking effect from the spreader, causing some strips of barley to appear greener and fuller than others. He had no opinion as to whether the streaking had any effect on yield, because the greener areas might not necessarily have produced more grain than the plants in the sparse areas. Dr. Dennis was of the opinion that the application of fertilizer did not cause any damage to the barley crop in that Stoco's alleged 140-bushel-per-acre goal was unrealistic, considering the amount of fertilizer that was applied to the fields. He testified

that a yield goal of 50 bushels per acre was more realistic for the Sandhills area and for Nebraska as a whole.

Although the plaintiff's expert witnesses had testified to the contrary, Dr. Dennis testified that any crop loss experienced on Leach Fields Nos. 3, 4, and 5 was caused by the acid nature of the soil, viruses, and loss of stand due to insects, wind damage, or desiccation.

Dr. Dennis also commented on the "hands-off" farm management approach employed by Stoltenberg:

Q. . . . . In your many years of experience have you ever seen the case where a farmer has turned over the management of his operation to a fertilizer and chemical dealer?

A. In all of my experience I have never seen a situation where the farmer would simply tell the fertilizer dealer that he had carte blanche to do whatever was necessary. The farmer, along with his banker, determines what is going to go on the field and what's to be spent, and the spending of the money is the regulating factor that determines what fertilizer or what chemical is going to be put on, and very often the two expectations are considerably different.

The evidence, when taken in the light most favorable to Madison's, was more than sufficient to sustain the jury verdict in favor of the defendant. The evidence was such that reasonable minds could differ and could not draw but one conclusion from the evidence. The trial court did not err in failing to grant the plaintiff's motion for directed verdict and motion for judgment notwithstanding the verdict.

It is unnecessary to consider the issues raised in the defendant's cross-appeal. The judgment of the district court is affirmed.

AFFIRMED.

HASTINGS, C.J., not participating.