LAURA T. NEECE, APPELLEE, V. JAMES D. SEVERA, M.D.,
DOING BUSINESS AS OMAHA PSYCHIATRIC ASSOCIATES, APPELLANT.
560 N.W.2d 868

Filed March 18, 1997. No. A-95-1124.

Timothy J. Cuddigan and Lisa M. Line, of Brodkey, Cuddigan & Peebles, for appellant.

Christian R. Blunk, of Chatelain, Blunk & Maynard, and Richard N. Berkshire and Angela L. Burmeister, of Andersen, Berkshire, Lauritsen & Brower, for appellee.

HANNON, MUES, and INBODY, Judges.

HANNON, Judge.

The appellant, James D. Severa, M.D., owns Omaha Psychiatric Associates (OPA), a firm practicing in the mental health field. The appellee, Laura T. Neece, a psychologist, became associated with OPA under a written contract. The contract provided OPA would bill Neece's clients, collect fees she earned, and after withholding OPA's share, remit the balance to Neece at least monthly. After several months Neece ended the association, and she later brought this action to recover from OPA the fees that she billed. Neece maintains the action is a suit for breach of contract, but we conclude it is an accounting action at law. Neece obtained a jury verdict for $13,660.09. OPA appeals, alleging that the trial court erred in submitting the question of damages because there was insufficient evidence of damages and that the jury was improperly instructed on the issue of damages. The jury instructions were not made a part of the transcript, and therefore, we do not consider that issue. The evidence can support the verdict only if the law and facts justify the conclusion that OPA's conduct justifies depriving it of the fee provided for it in the contract and that OPA must pay Neece at her billed rate for each hour she billed without proof that OPA has or will collect that rate per hour for her billings, if at all. We decide these issues against Neece and conclude that the evidence would support a verdict of only $226.08. Accordingly, we reverse the judgment and remand the cause with a provision for a remittitur, or for a new trial if the remittitur is rejected by Neece.

## FACTUAL BACKGROUND

OPA was an established business when Neece joined the firm in 1992. It is solely owned by Severa. He contracts with psychiatrists, psychologists, and other mental health professionals to supply them common office facilities, support staff, and billing services in connection with their individual practice of their profession. In this opinion, we will refer to the appellant as "OPA," but when Severa's actions individually are significant, we will refer to Severa by name. Both names refer to the same legal entity.

On October 7, 1992, the parties entered into an "Independent Contractor Agreement" by which Neece joined OPA. In that

contract, Neece agreed to practice her profession as a psychologist in an office which OPA would provide for her and others. (This was in Council Bluffs, Iowa.) (The action does not involve any professional dispute, and therefore the nature of the services and the method of supplying the same need not be described.) In the contract, OPA agreed to supply office space, clerical services, stationery, local telephone service, billing and collections services, advertisement in the yellow pages of the telephone directory, monthly statements of accounts, and other overhead items. Since there is no controversy over most of the provisions of the contract, we mention these provisions only so the reader can understand the nature of the parties' relationship.

The contract provision with regard to billing is of particular interest. It states:

> All billings for [Neece] shall be prepared on [OPA] letterhead, with the designation in said billing as to the name of [Neece] providing those services. All monies received, pursuant to such billings, shall be held by [OPA]. From the first $5,000 in gross fees collected for [Neece], [OPA] shall be entitled to 30 percent thereof. Any fees collected above $5,000 during the month [OPA] shall be entitled to 25 percent thereof (with the exception of fees received through Nebraska welfare, which shall always be subject to a 35 percent payment). [OPA] shall deduct [its percentages from] said fees, and shall remit a check monthly [for the balance less any funds advanced on behalf of Neece].

The term of the contract was for 6 months; thereafter, either party could terminate it upon 30 days' notice, and OPA would continue to send out billing statements for 1 year after termination.

Neece joined OPA in October 1992. At least by early 1993, Neece and other therapists were dissatisfied with the errors and other deficiencies in billing and accounting of OPA's staff. The details of the evidence in this regard will be described later in this opinion when we consider the sufficiency of the evidence.

Neece worked until May 1993, when she left for maternity leave, and she never returned to work. There is no claim for wrongful termination by either party.

## PLEADINGS

In her petition, Neece alleged the contract and the specific provision on division of fees, and she also alleged that on or about February 1, 1993, OPA breached the agreement "by wholly failing to prepare and perform proper billing and collection as required per said agreement" and that

> [t]o date, Defendant has wholly failed to provide to Plaintiff the monies due based upon said agreement, in the amount of $14,140, which consists of 70 percent of said amount due Plaintiff pursuant to the contract, together with 30 percent due to the Defendant's breach of his obligations under the contract.

Neece also alleged OPA failed to perform its duties of providing administrative support.

In its answer, OPA alleged the contract provision that it would send out billing notices for 1 year and alleged that Neece failed to give proper notice, but otherwise the answer amounted to a general denial. OPA also filed a counterclaim, alleging that OPA had been overpaid by Iowa Medicaid in the total sum of $7,357.59, that OPA had paid Neece her proportionate share of these overpayments, and that thereby Neece was overpaid in the amount of $5,150.31. OPA prayed for judgment against Neece for that amount. The verdict was for Neece; the only question on this appeal is the sufficiency of the evidence to support a verdict for Neece. The counterclaim has no bearing on the issue of this appeal, and therefore the evidence on the counterclaim will not be summarized.

The jury returned a verdict for Neece in the amount of $13,660.09. Because the jury instructions were not included in the record, we do not know what issues were submitted to it.

## ASSIGNMENTS OF ERROR

OPA alleges that the trial court erred (1) in instructing the jury relating to damages; (2) in submitting the issue of damages to the jury, as the evidence was insufficient as a matter of law; and (3) in failing to sustain its motion for new trial, as the jury verdict was excessive.

With respect to OPA's first assignment of error, relating to the jury instructions, the instructions are not in the transcript.

It is incumbent on the party appealing to present a record which supports the errors assigned, and absent such a record, the decision of the lower court should be affirmed. *Stoco, Inc. v. Madison's, Inc.*, 235 Neb. 305, 454 N.W.2d 692 (1990). An appellate court will not consider jury instructions complained of that are not included in the record. *Id.* See Neb. Ct. R. of Prac. 4 (rev. 1996). We therefore do not consider OPA's assignment pertaining to alleged errors in instructing the jury, and therefore we consider only the sufficiency of the evidence to support the verdict under any theory.

## STANDARD OF REVIEW

A jury verdict may not be set aside unless clearly wrong, and it is sufficient if there is competent evidence presented to the jury upon which it could find for the successful party. *Koster v. P & P Enters.*, 248 Neb. 759, 539 N.W.2d 274 (1995); *Nichols v. Busse*, 243 Neb. 811, 503 N.W.2d 173 (1993). When reviewing a jury verdict, an appellate court considers the evidence and resolves evidential conflicts in favor of the successful party. *Koster, supra*; *Chadron Energy Corp. v. First Nat. Bank*, 236 Neb. 173, 459 N.W.2d 718 (1990).

## DISCUSSION

The bill of exceptions in this case consists of 300 pages of recorded testimony and dialog between counsel and the court, and seven volumes of exhibits. One volume was introduced by Neece and six by OPA. Since the only question before the court is the sufficiency of the evidence to support the verdict, OPA's evidence is relevant only to the extent that it might tend to establish Neece's case. The significance and meaning of most of the documentary evidence is not explained either by the testimony of the foundational witnesses or by any information in the documents themselves. If the system of storing information on a form or in a computer is not explained, it is unintelligible to someone not familiar with the system. We found much of the information contained in the exhibits cryptic. We refuse to guess at the meaning of the information in the record, and we do not think a jury should be allowed to guess either. Perhaps the result would be the same either way, but this appeal is

largely being decided upon the admissions of the parties contained in their exhibits rather than upon the testimony by which they sought to prove their respective cases.

After having spent several hours studying the exhibits in conjunction with oral testimony, we have a greater appreciation for why equity courts developed an action for an accounting. "Generally, in order to be entitled to the equitable remedy of accounting, it is necessary to allege a fiduciary, trust, or confidential relationship; a complicated series of accounts; or the inadequacy of a remedy at law . . . ." *Lone Cedar Ranches v. Jandebeur*, 246 Neb. 769, 772, 523 N.W.2d 364, 368 (1994). The case was tried as a law action and therefore must be reviewed as a law action, even if it could have been tried as an equitable action. *Bricker v. Maytag Co.*, 450 N.W.2d 839 (Iowa 1990). Neece, of course, is entitled to bring this action as an action at law, but the extreme lack of clarity in the computer-kept records of OPA and the need for these records as a basis for any accounting would certainly justify an accounting in equity.

In the trial court, Neece's counsel maintained this was not an accounting action, but, rather, a breach of contract action (apparently upon a belief that damages for breach of contract could not be recovered in an accounting action). "[F]or an action for a legal accounting to lie, it must appear that 'defendant has received property or money, not belonging to him, which he is bound to account for to plaintiff, and that plaintiff is the owner of such property or money.'" *Harmon Care Centers v. Knight*, 215 Neb. 779, 785, 340 N.W.2d 872, 876 (1983) (quoting 1 C.J.S. *Accounting* § 4 (1936)). Such an action is based on contract. *Id.* This action is an action for a legal accounting, notwithstanding Neece's insistence to the contrary. That does not affect the outcome, however.

In addition to the 70 percent which Neece claims under her agreement, she seeks denial of the 30 percent which the contract provided OPA should receive. Both *Lone Cedar Ranches, supra*, a legal accounting action, and *Walker Land & Cattle Co. v. Daub*, 223 Neb. 343, 389 N.W.2d 560 (1986), an accounting in equity, are examples of cases where issues concerning the allowance of similar damages were litigated. In fact, the *Walker Land & Cattle Co.* court denied part of a commission similar to

the fee Neece seeks to deny OPA in this case. An accounting between the parties requires a determination of the following issues: (1) the entitlement of OPA to the contract fee, (2) the hourly rate upon which Neece may recover, (3) OPA's liability for uncollected billings, (4) the sufficiency of Neece's accounting evidence, (5) OPA's admissions by its accounting, and (6) whether Severa's admission during trial established Neece's case.

## OPA's Entitlement to Fee.

In her petition, Neece alleges, "Defendant is not entitled to receive 30 percent of Plaintiff's monthly billings . . . due to Defendant's continuous and ongoing breach [of the contract]," and she prays for "consequential damages in the amount of the return of Defendant's withholding of 30 percent of Plaintiff's monthly billings for the first $5,000.00, and any 25 percent withheld over $5,000, [and] prejudgment interest."

Neece cites general propositions of law to support her claim for damages, such as the following: The proper measure of damages in a contract case is the amount which will compensate the injured party for the loss which fulfillment of the contract would have prevented or which the breach of it has entailed, *Stansbery v. Schroeder*, 226 Neb. 492, 412 N.W.2d 447 (1987); the injured party is entitled to recover all of his or her damages, including the gains prevented as well as the losses sustained, provided the damages are reasonably certain and such as might be expected to follow the breach, *Lone Cedar Ranches v. Jandebeur*, 246 Neb. 769, 523 N.W.2d 364 (1994); and a plaintiff in a contract action has the burden of proving damages with as much certainty as the case permits, but proof to a mathematical certainty is not required, *Lis v. Moser Well Drilling & Serv.*, 221 Neb. 349, 377 N.W.2d 98 (1985). These are all well-recognized principles of the law of damages upon the breach of contract, but they throw no light upon the question whether OPA is entitled to collect the fee provided for in the contract. We believe the following cases and authorities shed light upon this issue.

In *Walker Land & Cattle Co., supra*, a principal sought to deny an agent his commission upon an accounting, because the

agent commingled funds, failed to keep records, frequently converted funds, and failed to make an accounting. Upon a de novo review, the *Walker Land & Cattle Co.* court found the agent had failed to keep records and failed to furnish accurate reports, but held that the trial court had properly allowed the agent a management fee for early years of the parties' relationship, although it reversed the trial court's allowance of the management fee for 1 year. The *Walker Land & Cattle Co.* court found that the agent willfully and materially breached its duty to the principal for that year. In so doing, the *Walker Land & Cattle Co.* court cited the Restatement (Second) of Agency § 382, comments *a.*, *b.*, and *d.* (1958), relative to the duty of an agent to keep and render accounts.

 The Restatement rule on depriving an agent of compensation is the following:

> An agent is entitled to no compensation for conduct which is disobedient or which is a breach of his duty of loyalty; if such conduct constitutes a wilful and deliberate breach of his contract of service, he is not entitled to compensation even for properly performed services for which no compensation is apportioned.

*Id.*, § 469 at 399. If this rule does not apply, then the principal is obligated to pay "(b) the value, not exceeding the agreed ratable compensation, of services properly rendered for which the compensation is not apportioned if, but only if, the agent's breach is not wilful and deliberate." *Id.*, § 456 at 375.

> A breach of contract is wilful and deliberate, as those words are herein used, only when the agent, in complete disregard of his contractual obligations, fails to perform or misperforms the promised services and has no substantial moral excuse for so doing, or is guilty of disloyal or grossly insubordinate conduct.

*Id.*, comment *c.* at 376.

Neece testified that OPA was not entitled to the fee "based on the fact that billing statements were not provided in a timely manner" and that OPA "did not provide the adequate billing services." She admitted that OPA provided the office space, clerical help, telephone service, utilities, and advertising in compliance with the contract. Neece opined that OPA was not entitled

to its fee because "[a]gain, based on the fact that billing statements were not provided in a timely manner. There were times when I didn't receive any payment at all and there [are] still many outstanding claims." Neece did not allege OPA willfully and deliberately breached the contract in complete disregard of its duties, nor does the above testimony support a finding of such. Thus, the question becomes whether Neece's evidence proves the damages with as much certainty as the case permits.

Neece herself testified that 15 claims (charges to Neece's clients) were billed to the incorrect unit of service and that seven billings to Iowa Medicaid were incorrect. Except for one series of statements that Iowa Medicaid paid at the rate of $9.77 where it should have paid at the rate of $39.08, she offered no specifics on the nature, amount, or consequences of any errors OPA might have made. The evidence shows OPA filed an amended application to correct at least some of the misbillings to Iowa Medicaid. Neece testified generally that some clients were listed as her clients when they were not her clients, that some of her clients were not listed when they should have been, and that she found errors where OPA was paid $70 when it should have been paid $39.08. She did not testify to the number of times OPA committed these errors, who might have committed them, how the errors might have occurred, or the amount of money involved in such errors. Nor did she offer any evidence tending to show how these errors damaged her.

Neece testified that the entire secretarial staff was dismissed and replaced, that billing statements were received on an irregular basis and contained many errors, and that it was a struggle to get the money she believed was owed her. At most, the evidence shows that the computer bookkeeping system produced errors; that it contained a "glitch"; that a new system was purchased and installed in about May 1993; that while waiting for the new computer system to be installed, one of the OPA employees decided not to put the current billings into the old computer system and thereby the accounting that Neece and others were entitled to receive could not be prepared until the new computer system was installed; and that OPA failed to give Neece the monthly accounting it agreed to produce, but the only

evidence of the reason for that failure was a poor computer-operated accounting system.

Neece testified that the problems increased while she was on maternity leave. She testified she received approximately $6,500 from OPA prior to August 1993. Shortly thereafter, she commenced the action to recover the damages she claims.

Neece's evidence on the errors OPA made in keeping a record of her billings and the collection thereof is so general and so lacking in the customary detail used to establish error in business records that it could not show OPA's actions were willful or deliberate. Neece's testimony is perhaps sufficient to cause an observer to have very little faith in the final figures produced by OPA's bookkeeping system, but it does not establish Neece was damaged due to OPA's poorly maintained and operated billing system. Nor does the evidence establish that Severa, by himself or with the help of his staff, committed such errors deliberately or out of disloyalty to Neece. We therefore conclude that the evidence does not justify a finding by the jury, assuming as we must that the jury was instructed on the point, that Severa or OPA willfully and deliberately breached the contract or that Severa or OPA was disloyal. We conclude OPA is entitled to the fee provided for in the contract.

### Neece's Hourly Rate.

In her accounting, Neece computes the amount she is entitled to receive upon the basis that she is entitled to $70 for every hour she billed her clients (e.g., 201 unpaid hours she spent with 41 clients at the rate of $70 per hour). The evidence establishes that Neece billed at the rate of $70 for a 50-minute hour. The evidence also establishes that Iowa Medicaid paid $39.08 per hour and not $70; that most of Neece's billings were paid by Iowa Medicaid; and that on some billings, but not all, Iowa Medicaid did pay at the $70 rate. OPA used this fact to establish a counterclaim. It argued that on those accounts where Iowa Medicaid paid $70 per hour, OPA has or must refund the over-payment to Iowa Medicaid, but that Neece was remitted a share of the overpayment. OPA argues it is entitled to recover the overpayment from Neece to the extent that it was paid to her.

Since we are reviewing the sufficiency of the evidence to support the verdict in favor of Neece, we do not consider this point.

Interestingly, Neece uses the fact that Iowa Medicaid paid $70 per hour for some billings as the justification for her position that she should be entitled to $70 per hour for all billings for which she has not been paid. The record is clear and Neece does not deny that Iowa Medicaid was not intentionally paying $70 per hour for Neece's billings, and any amount it did pay at that rate was in error. As discussed later in this opinion, the contract requires OPA to bill Neece's clients; the contract does not in any way make OPA responsible to collect $70 for each hour Neece billed to a client. We conclude that the evidence cannot support an accounting based on the assumption that Neece was entitled to be reimbursed at her billed rate for all billings.

### OPA's Liability for Uncollected Billings.

In substance, paragraph 8 of the contract, as quoted above, provides that OPA will send out statements for Neece, hold all money collected on these accounts, and after withholding its fee or any special advances, remit the money collected on her billings monthly. The contract also provides that upon termination of the agreement, OPA will continue this collection practice for 1 year. There is nothing in the contract which could imply OPA in any way guaranteed Neece's accounts receivable or that it agreed to purchase them upon termination. Except for the possibility of liability for loss due to negligent or intentional misconduct, there is no basis upon which Neece can assert that OPA is liable for accounts or billings that are not collected. Obviously, Neece has the obligation to prove the amount OPA collected. This failure of proof is the most severe shortcoming in Neece's evidence to support the verdict.

### Neece's Accounting Evidence.

The jury award of $13,660.09 rests upon the sufficiency of exhibit 11, a summary of Neece's accounting. It lists billings that Neece claims to be entitled to receive from 41 different clients, who are identified by number to protect the clients' privacy. The time she billed to each client is listed in one or more of three different columns. The first column is headed "Hours

Unpaid (Computed at $70 Each)," and this column has 41 entries and totals 201 hours. The second column is headed "Hours for Which Laura Was Paid Based on $39.08 Where Severa Received 70 (Computed at $30.92)," and it has 18 entries and a total of 49 hours. The third column is captioned "Hours for Which Laura Was Paid Based on $9.77 Where Severa Owed [sic] Received 70 (Computed at $60.23)," which had two entries with a total of 7 hours. Only one client's entry displayed charges in all three columns. There is also a column to display the amount of money Neece claims to be due for each client based upon the number of hours listed for that client. This column has total charges of $16,006.69. The exhibit also contains a statement that the amount $4,553 is "Severa's 30% withheld since start of lawsuit." The jury verdict of $13,660.09, the amount that Neece claims to be due her, was apparently arrived at by adding to the $16,006.69 the $4,553 withheld by OPA and subtracting the $6,899.60 Neece admits OPA paid her after she prepared exhibit 11.

Since we have determined that depriving OPA of its fee was not justified, the evidence does not support the verdict in at least the sum of $4,553. Since we have determined Neece is not entitled to recover on the basis of $70 per billed hour, the jury verdict is not supported by an even greater sum.

Neece introduced a large volume of documents to support exhibit 11. Since we conclude that exhibit 11 is based upon improper assertions, such as entitlement to an hourly rate of $70, and that Neece may not collect for billings when there is no proof OPA has collected from her clients, we need not consider the sufficiency of the supporting documents, as their only purpose was to lay foundation for her base figures listed in exhibit 11. However, through the introduction of these documents and the foundational testimony for them given by Neece, Neece made some important admissions. She admits that at least for some of her billings, OPA was paid by Iowa Medicaid at the rate of $39.08 per hour. Neece testified that one of her exhibits, exhibit 8, reflected her accounts receivable to be $7,591.11 and $7,840. She also responded "[y]es" to her counsel's question whether these figures "fairly and accurately reflect where you approximately thought you were in July of

1993?" Additionally, on cross-examination, Neece admitted to having received from OPA by check a total of $13,419; however, she added that this amount is not reflected on exhibit 11. Since exhibit 11 is wrong as found above, it cannot be sufficient to support the verdict of the jury, even if the base documents could be a sound foundation for exhibit 11.

### OPA's Accounting as Admission.

OPA introduced its own accounting. Neece is entitled to the benefit of OPA's evidence insofar as it constitutes an admission against OPA. OPA attempted to introduce exhibit 101. It was not received into evidence on the basis that it was redundant. In the process of offering this exhibit, OPA's counsel assured the judge that it was an accurate summary of OPA's other exhibits on the accounting. We find these other exhibits to be unintelligible. However, since this offered exhibit was put forth as a summary of those exhibits, and it is intelligible, we feel it is proper to use it for an admission by OPA and will use it for that purpose.

Exhibit 101 contains some intelligible admissions. It shows that Neece's total "charges" were $24,975, and it states the amount of these total charges that was "allowed," that is, paid by each payor. It shows that $18,058.36 was allowed by Iowa Medicaid, $447.12 by Nebraska Medicaid, $280 by other insurance carriers, and $378.91 by medicare and that clients paid $360.52. Exhibit 101 purports to show offsets claimed by OPA for refunds and adjustments, but the evidence is not complete enough to support a claim for refunds. Since we are considering only the sufficiency of the evidence to support a verdict for Neece, we need not consider the merits of these offsets.

Exhibit 101 shows that OPA collected $19,524.91 from Neece's billings. Under the contract, OPA was to receive 35 percent of all monies received through Nebraska welfare. Except for this 35-percent amount, both parties maintain that Neece is entitled to 70 percent of the balance of all that was collected. Neece was therefore entitled to $290.63 as her share of the $447.12 collected from Nebraska welfare and $13,354.45 for her 70 percent of the balance of the money collected. These admissions show that OPA owes Neece $13,645.08 less the

$13,419 which she admits to having received from OPA. These figures constitute an admission that OPA owes Neece $226.08, but there is no satisfactory evidence to support a verdict for a greater sum, and OPA's evidence is not sufficient to compel a judgment for a lesser sum in the face of the verdict for Neece.

*Severa's Admission During Trial.*

Neece testified that at approximately 4:30 p.m. on the first day of trial, apparently during a recess, Severa, in her presence and in the presence of the attorneys, said to her, "[Y]ou should have never hired those attorneys. I would have given you the money." Severa's lawyer told him to "shut up." On cross-examination, Severa admitted with respect to that conversation: "I said something like, you would have had your damn money way back, or something like that, if you hadn't got into this litigation, or something to that effect." One of the attorneys representing Neece in the trial testified with respect to this admission as follows: "Dr. Severa said something to the effect that he would have paid her the money he owed her had she not hired counsel to represent her in this matter."

With regard to any or all of these three versions as an admission, it is clear that Severa did not admit that he owed Neece the amount of money she claimed he owed her, but of course they tend to establish he owed her something. All of these three versions of his admission might have been admissible on that basis. However, by themselves they are not sufficient to support the verdict for $13,660.09.

This case is likely to be tried again. Therefore, we hasten to point out that Canon 5, DR 5-102(A) of the Code of Professional Responsibility provides that if a lawyer learns that he or she ought to be called as a witness on behalf of his or her client, then the lawyer shall withdraw from the conduct of the trial and his or her firm shall not continue representation in the trial. (Exceptions are provided in DR 5-101(B)(1) through (4), none of which apply in this case.) The attorney testified that she was an attorney representing Neece in the case. The record does not show she withdrew as an attorney, and the records of this court list her as Neece's counsel in this court. The lawyer's testimony or her continued representation appears to have been in violation of the Code of Professional Responsibility.

## CONCLUSION

We have concluded that the evidence will support a verdict for only $226.08, not for the $13,660.09 awarded by the jury, and thus a new trial is necessary. This is a minimal figure, but in view of the issues we have ruled upon on this appeal, Neece may conclude that she will not collect an appreciably greater sum upon a second trial. We therefore provide for a remittitur in the amount of $13,434.01. If Neece shall file an agreement to the remittitur within 30 days after the mandate is spread in the trial court, the trial court shall reduce the judgment to $226.08. If Neece shall not file a remittitur within that time, the jury verdict shall be vacated and a new trial granted.

REVERSED AND REMANDED WITH DIRECTIONS.