IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


VON KUHN V. GAVILON AGRICULTURE INV.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


CHRISTOPHER J. VON KUHN, APPELLANT,

V.

GAVILON AGRICULTURE INVESTMENT, INC., AND GAVILON FERTILIZER, LLC, NOW KNOWN AS
MACROSOURCE, LLC, APPELLEES.


Filed September 30, 2025.    No. A-25-005.


Appeal from the District Court for Douglas County: KIMBERLY MILLER PANKONIN, Judge.
Affirmed.

David A. Domina, of Domina Law Group, P.C., L.L.O., for appellant.

James G. Powers, Britni A. Summers, and Alexander K. Shaner, of McGrath, North, Mullin & Kratz, P.C., L.L.O., for appellees.


RIEDMANN, Chief Judge, and MOORE and WELCH, Judges.

WELCH, Judge.


INTRODUCTION

Christopher J. von Kuhn brought a breach of contract action against his employer, Gavilon Agriculture Investment, Inc. and Gavilon Fertilizer, LLC, now known as MacroSource, LLC (hereinafter referred to as "Gavilon"), alleging that Gavilon unlawfully reduced the pool of funds in an incentive plan for which he was eligible, resulting in von Kuhn receiving an incentive of $2.75 million instead of at least $5.5 million. Von Kuhn also alleged theories of recovery for an accounting and for unpaid wages and benefits under the Nebraska Wage and Payment and

- 1 -

Collections Act. The district court granted summary judgment in favor of Gavilon. Von Kuhn appeals from that judgment. For the reasons set forth herein, we affirm.

STATEMENT OF FACTS

BACKGROUND

For the past 34 years, von Kuhn was employed as a senior trader/merchandiser with Gavilon or its predecessor and successor companies until his retirement on June 20, 2022. Gavilon paid von Kuhn an annual base salary, which in fiscal year 2021 was $285,000. Von Kuhn also participated in Gavilon's long-term Commercial Incentive Plan (Plan) every year since that Plan was introduced. This case involves a dispute regarding the amount paid to von Kuhn pursuant to the Plan for fiscal year 2021, which ran from April 1, 2021, to March 31, 2022.

The Plan's recited purpose included providing Gavilon and its subsidiaries or affiliates an opportunity to attract and retain high-performing employees by providing selected employees with an opportunity to share in Gavilon's financial success. Each fiscal year, individuals selected for participation in the Plan would receive a copy of the Plan, along with an "Acknowledgement Notice" that informed them of their selection to participate in the Plan; the "Incentive Pool" from which they would participate; and "the aggregate percentage for the[ir] Incentive Pool ([i.e.] The percentage of [profit before tax and incentive] PBTI from which any award would be drawn)." Von Kuhn admitted that he had agreed to the acknowledgement notice accompanying the Plan, which stated:

> I acknowledge that as an employee of Gavilon, I have been offered an opportunity to participate in the Plan. By clicking on the "vote" button provided in the e-mail in which your copy of the Plan and this Acknowledgement Notice were attached and by selecting "Received," you hereby acknowledge that you have received a copy of the Plan and have carefully read and agree to the terms of the Plan.

As relevant here, for fiscal year 2021 (April 1, 2021, to March 31, 2022), Gavilon informed von Kuhn of, and von Kuhn acknowledged, his right to participate in the Plan for the fertilizer group with the award to be generated from an "Incentive Pool" calculated at 17 percent of the fertilizer group's PBTI for that period.

The Plan itself was divided into six sections. Section I provided "Background" on the Plan. Section II set forth the "Plan Design." Section III set forth the "Award Payments." Section IV provided the "Plan Administration." Section V provided "Miscellaneous Provisions." And Section VI provided "Definitions" of terms.

In setting forth employee entitlements to "Awards" during the "Measurement Period" (defined as being the fiscal year for which performance by employees would be analyzed for determining awards), selected portions of the Plan included the following language:

**II. Plan Design**

**A. Award Determinations.** . . .

Awards under the Plan are funded by a pool ("Incentive Pool") comprised of a percentage of Profit Before Tax and Incentive ("PBTI") of each participant's [Profit and

Loss] group(s). PBTI will be calculated in accordance with established Gavilon policies and procedures and in accordance with generally accepted accounting principles. *This Plan does not provide nor is there any requirement that the entire Incentive Pool be allocated among Plan Participants.* [Emphasis added.]

. . . .

**B. Award Adjustments**. Awards may be adjusted up or down or eliminated at any time for any reason, in accordance with the discretion of the Board. No participant shall have a legally binding right to any Award or any interest or earnings credited thereon, if any, until such Award is vested and payable.

. . . .

### III. Award Payments

**A. Current Awards.** All Awards under the Plan will be paid if, and only if, approved by the Board following the end of the Measurement Period. A participant's Award shall be paid in accordance with one of the following:

**1**. Where the Award does not exceed $100,000 (excluding Supplemental Employer Contributions), the entire Award shall constitute the participant's "Current Award." This Current Award will vest and be paid in a single lump sum payment on or before the date that is two and a half months following the end of the Measurement Period.

**2.** Where the Award exceeds $100,000 (excluding Supplemental Empolyer Contributions), the first $75,000.00 of the participant's Award and sixty percent (60%) of the Award in excess of $75,000.00 shall constitute the participant's "Current Award." A participant's Current Award will vest and be paid in a single lump sum payment on or before the date that is two and a half months following the end of the Measurement Period.

**B. Mandatory Award Deferral.** Any balance remaining after calculation of a participant's Current Award, will be subject to mandatory deferral. Such deferred Award will be allocated to a deferral account ("Account") and will be paid over a period of two (2) years, unless otherwise elected by the participant, subject to additional vesting conditions ("Mandatory Deferred award"). . . .

. . . .

**F. Forfeiture.** Except as otherwise specified in this Plan, any unvested portion of the participant's Award and/or Account will be immediately forfeited if the participant does not remain continuously employed and in good-standing with the Company through the applicable vesting and payment date.

**G. Payment of Deferred Award Accounts.** Payments from a participant's Mandatory Deferred Award Account and Voluntary Deferred Award Account will be made in accordance with the timing and form elected by the participant pursuant to a validly executed deferral agreement and Internal Revenue Code Section 409A ("Code Section 409(A)").

In all cases, participants will become vested in their Mandatory Deferred Award and/or Supplemental Employer Contributions as follows:

1. Fifty percent (50%) of a participant's Mandatory Deferred Award will vest on the date that is two and a half months (i.e., June 15) following the end of the second Fiscal Year that follows the year the Award was earned. In the absence of a valid deferral election, Mandatory Deferred Awards will be paid within 30 days from the vesting date.

. . . .

## VI. Plan Administration

**A. Administration.** Except as otherwise determined by the Board, the Plan shall be administered by the Board of Directors of Gavilon Agriculture Investments, Inc. (the "Board"), the Compensation Committee acting on behalf of the Board, or any other delegate of the Board. Senior management will submit to the Board for final approval recommendations regarding plan participants, Target Incentive Opportunities, Incentive Pool structure, and Awards. The Board may delegate any and all duties with respect to the Plan which are set forth herein, to a committee or committees. Such delegate may establish and follow such rules and regulations for the conduct of its business as it may determine to be advisable.

**B. Board Authority.** With respect to the Plan, the Board, or its delegate, has the authority to: construe and interpret the Plan and apply its provisions; promulgate, amend, and rescind rules and regulations relating to the administration of the Plan; amend, suspend, or terminate the Plan; authorize any person to execute, on behalf of the Company, any instrument required to carry out the purposes of the Plan; review and approve, subject to the limitations set forth in the Plan, those employees who shall be eligible participants; interpret, administer, reconcile any inconsistency in, correct any defect in and/or supply any omission in the Plan and any instrument or agreement relating to the Plan; and exercise discretion to make any and all other determinations which it determines to be necessary or advisable for the administration of the Plan.

Determinations by the Board shall be binding on all participants, provided that nothing in this Plan shall derogate from the authority of the Board to oversee the administration of the Plan and make any final decisions with respect to any matters arising under this Plan. All questions arising under the Plan, including those pertaining to its validity, interpretation and administration, shall be governed, controlled and determined in accordance with the applicable provisions of federal law and, to the extent not preempted by federal law, the laws of the State of Nebraska.

## V. Miscellaneous Provisions

. . . .

**B. Amendment and Termination.** The Plan may be amended from time to time or may be terminated at any time by the Board or the Compensation Committee acting on its behalf. There shall not be an obligation on the part of the Company to continue the Plan in the same or a modified form for any future periods following the effective date of the Plan.

**C. Funding**. This plan shall be unfunded and will not create (or be interpreted to create) a trust or separate fund. Neither the Company, the Board, nor any committee shall be required to establish any special or separate fund or to segregate any assets to assure the performance of its obligations under the Plan.

Fiscal year 2021 was an extraordinarily profitable year for Gavilon, due to market conditions that caused an increase in the price of fertilizer, resulting in huge profit margins for Gavilon. This resulted in the PBTI being 711 percent of the budgeted amount. As a result of these extraordinary conditions, the Board's Compensation Committee unanimously adopted a resolution to hold back $35 million from the Fertilizer Incentive Pool, reducing it from $70,087,311 to $35,087,311. The money withheld was held by Gavilon as retained earnings. Even after the reduction of the Fertilizer Incentive Pool, the Plan Awards were lucrative and remained one of the highest in Gavilon's history. From the reduced Incentive Pool, the Company's president recommended that von Kuhn receive an award of $2.75 million. The Board agreed and approved the award on May 17, 2022.

Von Kuhn announced his retirement effective June 30, 2022. On his final day of work, von Kuhn submitted a letter to Gavilon asserting that the Committee had "unlawfully denied compensation under the Plan in the amount of approximately $35 million" by reducing the Fertilizer Incentive Pool. After Gavilon rejected the allegations, von Kuhn filed a complaint against Gavilon for $2.75 million allegedly due to von Kuhn under three theories of recovery: breach of contract, accounting at law, and unpaid wages and benefits under the Nebraska Wage Payment and Collection Act.

In August 2024, Gavilon filed a motion for summary judgment. The hearing thereon was held in October 2024. Exhibits adduced during the hearing included a copy of the 2021 Plan; depositions of Gavilon's current and former President and CEO and its Chief Administration Officer; responses to interrogatories and requests for admissions; Gavilon's period and quarterly financial review statements; certain Gavilon news releases; selected minutes from Board of Directors meetings; and selected correspondence.

DISTRICT COURT'S ORDER

Following the conclusion of the summary judgment hearing, the district court granted summary judgment in favor of Gavilon, specifically finding that the Plan was insufficiently definite to be a binding contract and, by its own terms, gave Gavilon authority to not pay out the entire Incentive Pool. The court further held that, in the alternative, even if the Plan was a contract, there was no evidence that von Kuhn attained a vested interest in an award greater than the $2.75 million he received. The court further found that von Kuhn's claim for an accounting failed because no valid contract obligated Gavilon to pay an amount greater than what von Kuhn was awarded and that his claim under the Nebraska Wage and Payment Collection Act also failed because Gavilon did not agree to any compensation amount above that which had been remitted to von Kuhn. Von Kuhn has timely appealed to this court.

## ASSIGNMENTS OF ERROR

Von Kuhn's assignments of error, consolidated and restated, are that the district court erred in granting Gavilon's motion for summary judgment on von Kuhn's (1) contract claim, (2) request for an accounting, and (3) claim for payment under the Nebraska Wage Payment Collection Act.

## STANDARD OF REVIEW

An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Henderson State Co. v. Garrelts*, 319 Neb. 485, 23 N.W.3d 444 (2025). An appellate court reviews the district court's grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Id*.

The construction of a contract is a matter of law, in connection with which an appellate court has an obligation to reach an independent, correct conclusion irrespective of the determinations made by the court below. *Acklie v. Greater Omaha Packing Co.*, 306 Neb. 108, 944 N.W.2d 297 (2020).

## ANALYSIS

### CONTRACT CLAIM

Von Kuhn's first assignment of error is that the district court erred in granting summary judgment in favor of Gavilon based upon its determination that the Plan was not a contract. The gravamen of von Kuhn's complaint and argument is that Gavilon breached its contract with him by adjusting the value of the Incentive Pool from which his award was to be paid, resulting in a lower award to him.

A similar argument was addressed by the Nebraska Supreme Court in *Acklie v. Greater Omaha Packing Co., supra*, wherein the Court considered a former employee's breach of contract action against his former employer seeking payment under the terms of a deferred compensation agreement. Under the terms of that agreement, the employer established a general ledger account for the employee for the payment of deferred compensation to be funded at the discretion of the employer's board of directors. Following the employee's termination, the employer refused to pay the employee under the terms of the agreement, so the employee sued, claiming he had a vested right to payment and the employer breached its contract with him by failing to make payment under the terms of the agreement. In considering this argument, the Court recognized that "the principal issue" was whether the agreement was enforceable and recited the applicable law:

> A party seeking to enforce a contract has the burden of establishing the existence of a valid, legally enforceable contract. To create a contract, there must be both an offer and an acceptance; there must also be a meeting of the minds or a binding mutual understanding between the parties to the contract. It is a fundamental rule that in order to be binding, an agreement must be definite and certain as to the terms and requirements. It

must identify the subject matter and spell out the essential commitments and agreements with respect thereto.

Generally, mutuality of obligation is an essential element of every enforceable contract and consists in the obligation on each party to do, or permit something to be done, in consideration of the act or promise of the other. Mutuality is absent when only one of the contracting parties is bound to perform, and the rights of the parties exist at the option of one only. One of the most common types of promise that is too indefinite for legal enforcement is the promise where the promisor retains an unlimited right to decide later the nature or extent of his or her performance. In that situation, the promisor's unlimited choice in effect destroys the promise and makes it illusory. An illusory promise is one that is so indefinite that it cannot be enforced, or by its terms makes performance optional or entirely discretionary on the part of the promisor.

An agreement which depends upon the wish, will, or pleasure of one of the parties is illusory and does not constitute an enforceable promise. Without a mutuality of obligation, the agreement lacks consideration and, accordingly, does not constitute an enforceable agreement. As relevant here, an agreement to pay such wages as the employer desires is invalid.

*Acklie v. Greater Omaha Packing Co.*, 306 Neb. 108, 118-20, 944 N.W.2d 297, 305-06 (2020). In resolving the issue in favor of the employer, the Court found that a provision in the agreement "unmistakably grants [the employer] the sole authority to interpret and administer the agreement. Likewise, the provision clearly grants [the employer] binding authority to determine the valuation of the account and the amount of any payment due under the agreement." *Id.*, 306 Neb. at 117, 944 N.W.2d at 305.

We reach the same conclusion here. Under the clear and unambiguous terms of the Plan, the Plan granted Gavilon's Board of Directors unilateral discretion to adjust or eliminate an Award for an eligible employee "at any time for any reason" prior to vesting. That authority included, but was not limited to, discretion over the Incentive Pool itself, as the Plan explicitly provided that "the Plan does not provide nor is there any requirement that the entire Incentive Pool be allocated among Plan Participants." And as it relates to any claim by von Kuhn of a vested right in the Plan, the Plan specifically provided that Awards will be paid, if and only if, "approved by the Board following the end of the Measurement Period." And then, as to vesting, provision III of the Agreement provides when a payment obligation became vested, which was subsequent to the Board's approval of an Award and then dependent upon its payment terms.

Here, the Incentive Pool was reduced by the Board prior to approving von Kuhn's Award, a right Gavilon clearly and unambiguously reserved for the Board in the language of the Agreement. Once the Board approved von Kuhn's award, which was subsequent to the Board's decision to reduce the size of the Incentive Pool--again, a right which Gavilon unambiguously reserved in the Board--only then could the award become vested and only in accordance with the Award's payment terms. Similar to the facts and the Nebraska Supreme Court's holding in *Acklie*, the Board's unlimited discretion to reduce or eliminate Awards "at any time for any reason" prior to vesting destroyed any promise of mutuality of obligation and rendered that portion of the

agreement illusory and unenforceable. Just as in *Acklie*, "an agreement to pay such wages as the employer desires is invalid." *Id.*, 306 Neb. at 120, 944 N.W.2d at 306. As such, von Kuhn's claim that Gavilon was contractually obligated to allocate the entirety of the Incentive Pool when considering his award fails as Gavilon expressly provided in the Plan, to which von Kuhn agreed, that Gavilon had no such contractual obligation until an Award became vested.

Von Kuhn argues that this court should look beyond the Plan's language and consider the parties' previous course of dealings in establishing the terms of the parties' agreement. We reject that argument. As we stated before, we find the terms of the Plan clearly and unambiguously conferred an exclusive right in the Board of Directors to make or eliminate awards including the size of the Incentive Pool to be allocated, up until an Award was approved by the Board and subsequently vested in accordance with its payment terms. As such, we need not examine extrinsic evidence here as "[e]xtrinsic evidence is not permitted to explain the terms of a contract that is not ambiguous." *Facilities Cost Mgmt. Group v. Otoe Cty. Sch. Dist.*, 291 Neb. 642, 656, 868 N.W.2d 67, 77 (2015). And insofar as von Kuhn is arguing an exception to the parole evidence rule when language is "latently ambiguous," that exception does not apply simply because the parties are suggesting opposing meanings to contractual language. *Kluver v. Deaver*, 271 Neb. 595, 601, 714 N.W.2d 1, 6 (2006) ("because the parties to a document have or suggest opposing interpretations does not necessarily, or by itself, compel a conclusion that the document is ambiguous"). Compare *Plambeck v. Union Pacific RR. Co.*, 244 Neb. 780, 509 N.W.2d 17 (1993) (citing to will contest case where extrinsic evidence was necessary where two or more persons satisfy a description of one designee). Here, there is no ambiguity governing the language of the Plan, and no need to explore the history of prior awards made to von Kuhn under prior agreements that were independently issued and approved prior to the 2021 fiscal year. Nor are we allowed to consider extrinsic evidence to contradict the express language of the agreement itself. See *Acton v. Schoenauer*, 121 Neb. 62, 236 N.W. 140 (1931) (holding there can be no implied contract where there is express agreement between parties relative to same subject matter).

And to the extent von Kuhn is arguing that Gavilon should be equitably estopped from denying him a higher payout from the Incentive Pool prior to its reduction, we reject that notion because "[e]quitable estoppel cannot create a contractual obligation where one does not otherwise exist." *Christiansen v. County of Douglas*, 288 Neb. 564, 582, 849 N.W.2d 493, 507 (2014). It serves to protect rights already acquired, but it cannot create a new right or create a cause of action.

Taken together, based upon our reading of the language of the Plan, we find, on this record, that there is no genuine issue of material fact and that Gavilon was entitled to summary judgment on von Kuhn's breach of contract claim as a matter of law.

#### REQUEST FOR ACCOUNTING

Next, we address the court's grant of summary judgment in favor of Gavilon on von Kuhn's request for an accounting.

In *Neece v. Severa*, 5 Neb. App. 556, 561, 560 N.W.2d 868, 872 (1997), this court stated: "[F]or an action for a legal accounting to lie, it must appear that 'defendant has received property or money, not belonging to him, which he is bound to account for to plaintiff, and that plaintiff is the owner of such property or money.'" *Harmon Care Centers v. Knight*,

215 Neb. 779, 785, 340 N.W.2d 872, 876 (1983) (quoting 1 C.J.S. *Accounting* § 4 (1936)). Such an action is based on contract. *Id.*

Here, the funds for which von Kuhn requests an accounting are those allegedly due him under the Plan. Having determined that there is no viable contract claim, and that Gavilon was not in possession of funds belonging to von Kuhn, no basis existed for an accounting. Accordingly, the district court properly granted summary judgment in favor of Gavilon and dismissed von Kuhn's request for an accounting.

CLAIM UNDER THE NEBRASKA WAGE PAYMENT AND COLLECTION ACT

Regarding von Kuhn's claim under the Nebraska Wage Payment and Collection Act, "wages" are defined, in pertinent part, as "compensation for labor or services rendered by an employee, including fringe benefits, when previously agreed to and conditions stipulated have been met by the employee, whether the amount is determined on a time, task, fee, commission, or other basis." Neb. Rev. Stat. § 48-1229(6) (Reissue 2021). "A bonus can qualify as wages if the employer and employee agreed to it in advance." *Law Offices of Ronald J. Palagi v. Howard*, 275 Neb. 334, 352, 747 N.W.2d 1, 15 (2008). "Relief, if any, under the Nebraska Wage Payment Collection Act is specifically based on the agreement to pay the employee." *Hoagbin v. School Dist. No. 28-0017*, 313 Neb. 397, 407, 984 N.W.2d 305, 312 (2023).

Here, having previously found that the Plan lacked mutuality of obligation in that Gavilon had the right to reduce the size of the Incentive Pool prior to approving an Award, there was no binding obligation created by Gavilon to von Kuhn prior to an Award, which made that portion of the agreement unenforceable. And similar to *Acklie v. Greater Omaha Packing Co.*, 306 Neb. 108, 123, 944 N.W.2d 297, 308 (2020), because that portion of the Plan that von Kuhn seeks to enforce is unenforceable, i.e. the Board's discretionary right to adjust the Incentive Pool prior to considering an award, von Kuhn's claim under the Nebraska Wage Payment and Collection Act fails "as a matter of law."

CONCLUSION

Having determined that the Plan lacked mutuality of obligation and was unenforceable, the district court properly granted summary judgment in favor of Gavilon. The order of the district court is affirmed.

AFFIRMED.